CHOATE, HALL & STEWART vs. SCA SERVICES, INC.

Suffolk. April 5, 1979. — July 27, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, & ABRAMS, JJ.

*Conflict of Laws. Contract*, Parties.

The question of the right of an intended beneficiary to sue on a contract was to be decided in accordance with the law of Massachusetts where the contract was executed in Massachusetts, the plaintiff was a Boston partnership, the defendant's principal place of business was in Massachusetts, and the promisee on the contract resided in Massachusetts, even though the defendant was incorporated in Delaware and the contract stated that the defendant would indemnify the promisee for certain expenses "to the maximum extent permissible under Delaware law." [540-542]

This court adopted retroactively the general rule that creditor beneficiaries may sue on contracts to which they are not parties. [542-546]

Where the parties to a contract using words of indemnification had agreed that payments under the indemnification provision would be made directly to a third party, the third party was a creditor beneficiary entitled to maintain an action against the promisor on the contract. [546-548]

CIVIL ACTION commenced in the Superior Court on July 25, 1977.

The case was heard by *Bonin*, C.J., on a motion for summary judgment.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Mark A. Michelson (John A. Nadas* with him) for the plaintiff.

*Marshall Simonds (Carol Goodman* with him) for the defendant.

KAPLAN, J. We hold on the facts of the case so far disclosed that the plaintiff, an "intended" beneficiary, of the "creditor" type, of a contract between the defendant (promisor) and another (promisee), may maintain this action to enforce the defendant's promise. In so deciding we make a long anticipated but relatively minor change in the law of the Commonwealth.

The plaintiff law partnership Choate, Hall & Stewart[1] commenced this action against the defendant SCA Services, Inc. (a company doing a waste disposal business), to recover fees for legal services performed for one Berton Steir. The claim is based on a provision of an agreement between the defendant and Steir (among others) by which the defendant undertook to pay legal fees incurred by Steir in circumstances and under conditions to be detailed below.

The record made on the defendant's motion for judgment on the pleadings, converted through the reception of affidavits into a motion for summary judgment (see Mass. R. Civ. P. 56, 365 Mass. 824-826 [1974]), was, briefly stated, as follows. In March, 1976, a dispute arose within the board of directors of the defendant corporation, dividing the board four members to four. The dispute centered on allegations that one Christopher P. Recklitis, formerly president and treasurer of the corporation, had engaged in a series of transactions from 1972 to 1975 by which he diverted funds unlawfully from the defendant to himself or his controlled corporations. Under the scheme alleged, Recklitis contrived to withdraw moneys from the defendant as loans and used them to pay personal debts, while falsely informing the defendant's auditors that the loans had legitimate corporate purposes. Further, Recklitis caused various properties owned by him to be purchased by the defendant at grossly excessive prices. He also used corporate funds to make unauthorized and unreported

---

[1] We use the collective designation of the partnership, as do the parties.

bribes and payoffs. The defendant became aware of some
of these alleged misdeeds in 1975 and retained counsel to
carry out an investigation. It was completed in March,
1976, and in consequence the defendant brought separate
actions against Recklitis, Stanton L. Kurzman, a member
of the board, and Steir, formerly president and at the
time of suit chairman of the board. This third suit against
Steir charged him with breach of fiduciary duties, negli-
gent mismanagement, and intentional waste of corporate
assets; there were allegations that Steir knew of some of
Recklitis's illegal activities and had assisted him in their
perpetration. About the same time in 1976, Steir, Kurz-
man, and two other members of the board instituted two
actions against the defendant herein. (The grounds do not
appear from the present record.)

With the board at an impasse, as noted, and cross-liti-
gations pending, settlement negotiations commenced on
June 24, 1976, which on August 13, 1976, resulted in a
contract among the eight directors and the defendant. It
was agreed that the four law suits (those mentioned other
than that against Recklitis) would be dismissed with
prejudice and without costs, and there were to be mutual
releases of all those claims, of which the parties to those
suits had actual notice, that had been or could have been
asserted therein. Kurzman, Steir, and the two directors
aligned with them agreed to resign as board members or
officers of the defendant or its subsidiaries, and to deliver
irrevocable proxies of shares of the defendant owned by
them to designated proxy agents. The defendant was to
enter into a contract with Steir by which Steir would
serve as a consultant to the defendant; and the defendant
was to pay the resigning directors the legal expenses in-
curred by them before the date of the settlement agree-
ment, as well as the reasonable out-of-pocket expenses
they had laid out in the performance of their duties as
directors or officers of the defendant.

We come now to the further provision of the settlement
contract which is in issue in the present case. By that

provision, set out in the margin,[2] the defendant agreed to "continue to indemnify and hold harmless" each of the resigning directors for "all losses, liabilities or expenses" incurred by him resulting "from any acts or omissions to act . . . while a director, officer or employee of [the defendant] or any of its subsidiaries . . . and each of the [resigning directors] may select his own counsel whose reasonable fees and out-of-pocket expenses will be paid on a current basis directly by [the defendant], all to the maximum extent permissible under Delaware law." The obligation was expressly stated to include legal fees and expenses to arise from a then pending investigation of the defendant by the Securities and Exchange Commission.

The agreement was executed by the eight directors and the defendant. The plaintiff law firm had represented Steir throughout the preceding negotiations.

In pursuance of the agreement, the defendant twice paid the plaintiff its submitted statements of fees and expenses for representing Steir in the SEC matter. The defendant made the payments direct to the plaintiff, upon the plaintiff's statements addressed to the defendant, followed by Steir's letters of request to the defendant. The defendant pursuant to the agreement made similar payments direct to other attorneys representing Steir, as well as to attorneys retained by the other resigning directors.

---

[2] "SCA shall continue to indemnify and hold harmless each of the parties of the first part for any and all losses, liabilities or expenses, if any (other than . . .), suffered or incurred by such party arising out of or resulting from any acts or omissions to act by such party while a director, officer or employee of SCA or any of its subsidiaries prior to the effective date hereof and each of the parties of the first part may select his own counsel whose reasonable fees and out-of-pocket expenses will be paid on a current basis directly by SCA, all to the maximum extent permissible under Delaware law. SCA's current charter and by-law provisions with regard to indemnification will not hereafter be changed to terms which are in any respect less favorable to the parties of the first part. This obligation includes without limitation all legal and other fees and expenses incurred after the date hereof and arising from the Securities and Exchange Commission investigation of SCA, File No. HO-867."

But on the plaintiff's statements of March 1 and May 28, 1977, respectively for $18,345.34 and $10,137.03, the defendant refused payment. The defendant had apparently learned of an SEC determination to bring suit; it took the position that it would decline further payments to the plaintiff (or other attorneys for Steir) until Steir vindicated himself in the SEC case or restored to the defendant the $125,000 it claimed Steir had wrongfully abstracted from it. On August 8, 1977, the SEC in fact commenced a civil action in a United States District Court against Recklitis, Kurzman, Steir, and others, based in substance on the alleged Recklitis and related depredations. The defendant, however, has continued to make payments to attorneys representing Kurzman because, it says, Kurzman has made good to the defendant the amounts he earlier misappropriated.

The plaintiff brought the present action on July 25, 1977, praying a declaratory judgment. Before answer, the plaintiff applied for a preliminary injunction enjoining the defendant from failing to pay the March and May bills, or bills that would be submitted for later work on Steir's behalf. The injunction issued (without opinion) on condition that the plaintiff post bond.

The defendant's answer, besides denials, asserted a number of affirmative defenses: that the plaintiff was not a party to the settlement agreement and therefore could not sue to enforce it; that indemnification was unlawful in the circumstances by Massachusetts, Delaware, and Federal law; that the provision sued on had been procured by misrepresentations (including failure to disclose material facts) on the part of Steir. Also asserted was a claim to set off the $125,000 against any recovery to which the plaintiff would be otherwise entitled. The defendant moved for judgment on the pleadings on the first affirmative defense mentioned — that the plaintiff, not a party to the agreement, was disabled from suing to enforce it. Affidavits were filed on both sides with respect to the negotiation of the critical provision.

Treating the motion as one for summary judgment, the judge held for the defendant, applying Massachusetts law as to the standing of third-party beneficiaries. Thereupon the plaintiff moved to amend its complaint to substitute Steir for itself as plaintiff in the action and correspondingly as the party to the preliminary injunction. The motions were denied. Later the judge granted the defendant's motion to enforce liability on the bond obligation in the amount of $34,526.31. The plaintiff appealed from the summary judgment, and from the order denying its motions to substitute; it also appealed from judgment for the amount stated. The appeals were consolidated and are brought here on our own motion.

We discuss a choice of law issue and then pass to the question of the plaintiff's standing to sue. Other issues resolve themselves accordingly.

1. *Choice of law.* The judge was correct in concluding that the question of the right of the plaintiff to sue on the contract should be decided in accordance with the law of Massachusetts. Choice of law was important for the judge below, as he conceived that the law of Massachusetts on the beneficiary's right differed from that of Delaware. As we now declare the law of Massachusetts, it is probably similar to Delaware's; but since we cannot be altogether sure of Delaware's hypothesized precise disposition on the particular facts, choice of law may remain significant, and we discuss it.[3] Traditionally this court has held, as a general rule, that material issues arising in actions to enforce contracts are to be answered accoi ding to the law of the place where the contract was made (see *Cameron* v. *Gunstock Acres, Inc.*, 370 Mass. 378, 381-382 [1976]; *Dicker* v. *Klein*, 360 Mass. 735, 736 [1972]; Fine, Massa-

[3] Delaware allows suit by creditor beneficiaries (see *Oliver B. Cannon & Son* v. *Dorr-Oliver, Inc.*, 336 A.2d 211, 215-216 [Del. 1975]; *Blair* v. *Anderson*, 325 A.2d 94, 97 [Del. 1974]), but one cannot predict with certainty its position on particular questions such as the question of interpretation of the contract language discussed in our text at point 2 below.

chusetts Contract Cases and Problems in the Choice of Law, 43 Mass. L.Q. No. 3, at 46 [1958]), and that rule has been held to comprehend the issue of third-party beneficiary rights. See *Carnegie* v. *Morrison,* 2 Met. 381, 398-400 (1841). It has been recognized that reference to the law of the place of making can produce awkward or arbitrary results where that place had no or little other connection with the contract or the parties (see A.T. von Mehren & D.T. Trautman, The Law of Multistate Problems 183-193 [1965]), and almost all States have replaced place-of-making or other one-factor tests with a more functional approach. See *Breslin* v. *Liberty Mut. Ins. Co.,* 134 N.J. Super. 357 (1975) ("interest" analysis); Restatement (Second) of Conflict of Laws § 188 (1971) ("most significant relationship"); R. Leflar, American Conflicts Law § 150 (3d ed. 1977). Similar ideas have been at work in our recent decisions transforming the rule about applying to a tort the law of the place of the happening. See *Pevoski* v. *Pevoski,* 371 Mass. 358, 359-361 (1976).

The facts of the present case deprive us of an opportunity to elect among the extant doctrines, for not only was the contract executed in Massachusetts, but the plaintiff is a Boston partnership, the defendant's principal place of business is in Massachusetts, Steir resides in Massachusetts, and all but the early negotiations of settlement took place here. It is true the defendant was incorporated in Delaware but it has no other substantial contact with that State.[4] (The facts were brought out in affidavits.)

There is argument that the reference in the contract to "the maximum extent permissible under Delaware law" ought to be taken as an agreement that Delaware law should govern all issues emanating from the settlement agreement, including the issue of who might maintain

---

[4] There is a sense in which the question of beneficiary's standing to sue may be regarded as one of litigative "procedure." See Lord Denning, M.R., in *Beswick* v. *Beswick,* [1966] Ch. 538, 557 (C.A.), aff'd, [1968] A.C. 58 (H.L.). This approach, too, leads to applying the law of Massachusetts.

suit. Cf. *Maxwell Shapiro Woolen Co.* v. *Amerotron Corp.*, 339 Mass. 252 (1959); G. L. c. 106, § 1-105(1); Restatement (Second) of Conflict of Laws § 187 (1971). We join the judge below in thinking the quoted words indicate no such understanding; they are read most plausibly as a reference to the Delaware corporation law to fix the permissible extent of a corporation's indemnification of its employees.[5] Other language would have been used if the parties had the broader purpose. See *Massengale* v. *Transitron Elec. Corp.*, 385 F.2d 83, 86-87 (1st Cir. 1967). (Of course, there is nothing unusual about the laws of different States applying respectively to various phases of a single transaction or incident. See *Pevoski* v. *Pevoski, supra* at 360-362.) Nor can we accept the suggestion that the plaintiff's standing to sue is an issue related to "internal corporate affairs" to be governed by the law of the State of incorporation. See Restatement, *supra* §§ 301-302.

2. *Suit by third-party beneficiary.* As recently observed in *Falmouth Hosp.* v. *Lopes*, 376 Mass. 580, 582 (1978), the law of the Commonwealth before the mid-Nineteenth

---

[5] Delaware Corporation Law § 145 contains extensive provisions relating to indemnification of corporate officers, directors, and employees. To summarize: A corporation ordinarily has power to indemnify an officer or director for expenses, fines, and amounts paid in settlement of any civil, criminal, administrative, or investigative proceeding brought for actions taken as corporate agent if the officer or director "acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation." § 145(a). (Different rules apply to indemnification with respect to actions brought by or in the right of the corporation. § 145[b].) Under § 145(e), expenses "may be paid by the corporation in advance of the final disposition of such action ... upon receipt of an undertaking by ... the director, officer ... to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the corporation as authorized in this section." It was evidently pursuant to this provision that the statements were to be paid "on a current basis": in his letters requesting payment, Steir stated, "I hereby undertake and agree to pay to SCA the amount so paid ... if and to the extent that it shall ultimately be determined that I am not entitled to such reimbursements or payments for my account, pursuant to Section 145(a)-(c) of the Delaware General Corporation Law."

Century looked with considerable favor on enforcement of a contract by an outsider for whose benefit it was made;[6] and that was the view generally taken in this country.[7] But in *Mellen* v. *Whipple*, 1 Gray 317, 321 (1854), this court, impressed by English authority,[8] wrote that "a plaintiff, in an action on a simple contract, must be the person from whom the consideration of the contract actually moved, and . . . a stranger to the consideration cannot sue on the contract. The rule is sometimes thus expressed: There must be a privity of contract between the plaintiff and defendant, in order to render the defendant liable to an action, by the plaintiff, on the contract." But an abstract notion of "privity" serves no better purpose here than elsewhere in the law: compare the attack on privity as a limiting conception in the tort law. Prosser, The Assault upon the Citadel, 69 Yale L.J. 1099 (1960). If privity requirements reflected a disinclination to compel a contracting party to meet in litigation a person with whom he had not chosen to do business, they were a reminder of a simple, neighborly society already on the way out, and now long vanished. See L. M. Friedman, Contract Law in America 121-122 (1965). At all events, American courts, under the inspiration of *Lawrence* v. *Fox*, 20 N.Y. 268 (1859), have held quite generally that "creditor" beneficiaries may sue on contracts to which they were not parties.[9] Professor Corbin says: "If the

---

[6] See *Fitch* v. *Chandler*, 4 Cush. 254 (1849); *Carnegie* v. *Morrison*, 2 Met. 381 (1841); *Cabot* v. *Haskins*, 3 Pick. 83 (1825); *Hall* v. *Marston*, 17 Mass. 574 (1822); *Mason* v. *Waite*, 17 Mass. 558 (1822); *Arnold* v. *Lyman*, 17 Mass. 400 (1821); *Felton* v. *Dickinson*, 10 Mass. 287 (1813); *Lent* v. *Padelford*, 10 Mass. 230 (1813).

[7] See Restatement (Second) of Contracts, introductory note to c. 6 (Tent. Drafts Nos. 1-7, 1973).

[8] See cases cited in 1 Gray at 319. For the modern English view, see *Beswick* v. *Beswick, supra*; 1 J. Chitty, Contracts 1118-1121 (24th ed. 1977).

[9] For the historical development, see 4 A. Corbin, Contracts §§ 827-832 (1951); G.C. Grismore, Contracts § 237 (Murray ed. 1965). As to analogous foreign law doctrine, see K. Zweigert & H. Kötz, An Introduction to Comparative Law 124 ff. (T. Weir trans. 1977).

promisee in a contract contemplates the present or future existence of a duty or liability to a third party and enters into the contract with the expressed intent that the performance contracted for is to satisfy and discharge that duty or liability, the third party is a creditor beneficiary" entitled to enforce the contract. 4 A. Corbin, Contracts § 787, at 95 (1951).

This court has in fact frequently recognized the right of suit of creditor beneficiaries fitting Corbin's description, but it has been in the form of "exceptions" to (or formulas of evasions of) the supposed general prohibitory rule of the *Mellen* case. Thus we have been able to find that the promisor had "in his hands money which, in equity and good conscience, belongs to" the creditor.[10] Or that the promisee could sue as "trustee" for the third party.[11] Or that the promisee's right of exoneration was an asset recoverable from the promisor by a creditor's suit in equity.[12] Other exceptions, some of them statutory, were more particularized.[13] Scholars have catalogued and

---

[10] The language appeared in *Mellen* v. *Whipple*, 1 Gray 317, 322 (1854). See *Wickwire Spencer Steel Corp.* v. *United Spring Co.*, 247 Mass. 565 (1924); *Exchange Bank* v. *Rice*, 107 Mass. 37 (1871); *Putnam* v. *Field*, 103 Mass. 556 (1870); *Fitch* v. *Chandler*, 4 Cush. 254 (1849); *Hall* v. *Marston*, 17 Mass. 574 (1822).

[11] See *Boyden* v. *Hill*, 198 Mass. 477 (1908); *Grime* v. *Borden*, 166 Mass. 198 (1896). A "trust" theory was also a basis for recovery by third parties in England, but this approach has been curtailed since 1930. See 1 J. Chitty, Contracts 1118-1121 (24th ed. 1977).

[12] See G. L. c. 214, § 3(6); *Rhoades* v. *Secunda*, 296 Mass. 1 (1936); *Forbes* v. *Thorpe*, 209 Mass. 570 (1911); *Poland* v. *Beal*, 192 Mass. 559 (1906); *Collins Mfg. Co.* v. *Wickwire Spencer Steel Co.*, 14 F.2d 871 (D. Mass. 1926).

[13] See G. L. c. 149, § 29A (enforcement of surety bond); G. L. c. 175, §§ 111, 125 (of certain insurance policies); G. L. c. 106, § 2-318 (third-party suit for breach of warranty); *Johnson-Foster Co.* v. *D'Amore Constr. Co.*, 314 Mass. 416 (1943) (enforcement of explicit contractual provision for third-party recovery); *Palmer Sav. Bank* v. *Insurance Co. of N. America*, 166 Mass. 189 (1896) (suit by mortgagee against mortgagor's insurer).

assembled the exceptions to show that despite our formal adherence to the *Mellen* doctrine, we have actually reached nearly the same results as other jurisdictions which have rejected it. See L. L. Fuller & M. A. Eisenberg, Basic Contract Law 890-891 (1972); Note, The Third Party Beneficiary Rule in Massachusetts, 8 Suffolk U.L. Rev. 130 (1973); Bernhard, Third Party Beneficiary Rights in Massachusetts, 49 Mass. L.Q. 159 (1964); Note, Contracts for the Benefit of Third Persons in Massachusetts, 28 B.U.L. Rev. 476 (1948). But of some of the exceptions, it has been said, with justification, that they are "rationalization[s] after the event" with "obvious weaknesses" of analysis. 4 A. Corbin, *supra* § 790, at 121.[14] And there has been uncertainty as to the scope of various exceptions.[15]

The rather confusing patchwork should be supplanted by the general rule now prevalent, which avoids circuity of action and is calculated to accord with the probable intentions of the contracting parties and to respond to the reasonable reliance of the third-party creditor.[16] As we now adopt the general rule,[17] we need not pause to consider whether the present case can by any possibility be squeezed into one or other of the "exceptions"; the plaintiff shows a most restrained enthusiasm in trying to do this. We do not hesitate to apply a general rule "retroac-

[14] Thus note the analytic infirmities of the "trust" and "asset" theories in 4 A. Corbin, *supra* at §§ 854, 790.

[15] See the discussion in Note, The Third Party Beneficiary Rule in Massachusetts, 8 Suffolk U.L. Rev. 130, 137-148 (1973).

[16] See 4 A. Corbin, *supra* at § 788; Jones, Legal Protection of Third Party Beneficiaries: On Opening Courthouse Doors, 46 U. Cinn. L. Rev. 313, 330-331 (1977); Note, Third Party Beneficiaries and the Intention Standard: A Search for Rational Contract Decision-Making, 54 Va. L. Rev. 1166 (1968); Note, The Third Party Beneficiary Concept: A Proposal, 57 Colum. L. Rev. 406 (1957).

[17] The simultaneous existence of the statutory "exceptions" to be enforced while they stand will not, we think, create any material difficulties.

tively" to the present case, for we have repeatedly reserved the point whether we would repeal so much of · *Mellen* v. *Whipple* as remained; the handwriting has long been on the wall.[18] It happens, moreover, that no recent case has been cited in which the *Mellen* doctrine was used to deny recovery to a beneficiary of the creditor variety.[19]

We have yet to consider in relation to the particular facts whether the plaintiff qualifies as a creditor beneficiary entitled to sue the promisor, or, on the contrary, is no more than an "incidental" beneficiary without such a right of suit. We search for indicia of intention against the background of the transaction. See Restatement (Second) of Contracts § 133 (Tent. Drafts Nos. 1-7, 1973). The defendant argues that the contract provision was one for indemnification alone, and in such situations the third party has usually not been accorded a right of action against the indemnitor to recover the payments due the indemnitee. "The performance promised must be one that will in fact discharge the promisee's (or another party's) obligation to a third person; if it will not do this, the third person may be a creditor of the promisee but he is not a creditor beneficiary of the contract. Such is the case where the defendant has promised an obligor (or debtor) to indemnify him and save him harmless with respect to the obligation or debt." 4 A. Corbin, *supra* § 787, at 102. This view is reflected in many decisions.[20] Now it is true that the provision at bar says that the

---

[18] *Falmouth Hosp.* v. *Lopes*, 376 Mass. 580, 583 (1978); *Merrill* v. *Kirkland Constr. Co.*, 365 Mass. 110, 114-115 (1974); *Boston & Me. R.R.* v. *Construction Mach. Corp.*, 346 Mass. 513, 521 & n.5 (1963); *Waltham Truck Equip. Corp.* v. *Massachusetts Equip. Co.*, 7 Mass. App. Ct. 580, 585 n.5 (1979).

[19] The defendant cites *Van Dusen Aircraft Supplies of New England* v. *Massachusetts Port Auth.*, 361 Mass. 131 (1972), and *Gustafson* v. *Doyle*, 329 Mass. 473 (1952), as cases in which the rule of *Mellen* v. *Whipple* was relied on for decision, but neither was in the pattern of a creditor beneficiary.

[20] See, e.g., *Ogden Dev. Corp.* v. *Federal Ins. Co.*, 508 F.2d 583, 587-588 (2d Cir. 1974); *American Empire Ins. Co.* v. *Fidelity & Deposit Co.*,

defendant is to "indemnify and hold harmless each of the parties" (resigning directors), and it may also be noted that Steir in his covering letters referred to "amounts which [the defendant] may reimburse me or pay for my account." The defendant would conclude that the expressed intent was to benefit Steir, not his attorneys, and any benefit flowing to the plaintiff should be regarded as "incidental."

This, however, would disregard the fact that the parties agreed the payments under the clause would be made "directly" to Steir's counsel. The defendant concedes that this language "changes the pocket into which the indemnification payments flow." The difference is not trivial. If payments were to be made to Steir, performance by the defendant would not discharge Steir's obligation to the plaintiff; the contrary is true when payments are to be made direct to the plaintiff, and it becomes very plausible to allow the plaintiff his action against the defendant. The distinction is taken in numerous decisions and in both Restatements of Contracts.[21] The result is not al-

---

408 F.2d 72, 76 (5th Cir. 1969); *Ferrigno* v. *Ocean Transp. Ltd.*, 309 F.2d 445 (2d Cir. 1962); *In re A. C. Becken Co.*, 75 F.2d 681 (7th Cir. 1935); *Morro Palisades Co.* v. *Hartford Accident & Indem. Co.*, 52 Cal. 2d 397, 402-403 (1959); *Ferguson* v. *Marsh*, 37 Cal. App. 482 (1918); *Ronnau* v. *Caravan Int'l Corp.*, 205 Kan. 154, 159-160 (1970); *Tomaso, Feitner & Lane, Inc.* v. *Brown*, 4 N.Y.2d 391 (1958); *Cruickshank* v. *Ellis*, 178 Minn. 103 (1929); *Washburn* v. *Interstate Inv. Co.*, 26 Or. 436 (1894); *Burke* v. *North Huntingdon Township*, 390 Pa. 588, 598 (1957).

[21] "B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is interpreted as a promise that B will pay C, D and E, they are intended beneficiaries . . .; if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental benficiaries." Restatement (Second) of Contracts § 133, Illustration 3 (Tent. Drafts Nos. 1-7, 1973). The same example appeared as Illustration 9 to Restatement of Contracts § 133 (1932). (In the second Restatement, the class of "intended" beneficiaries engrosses as a subclass the "creditor" beneficiaries of the first Restatement.)

For cases recognizing or relying on the distinction mentioned, see *Aetna Ins. Co.* v. *Eisenberg*, 294 F.2d 301, 305-306 (8th Cir. 1961);

tered merely because words of indemnity have been used (here in company with the "directly" language). "The mere form of the words should not be conclusive . . .; surrounding facts may indicate that payment direct to the creditor was the kind of indemnification that the parties intended." 4 A. Corbin, *supra* § 787, at 102. See *Acoustics, Inc.* v. *American Sur. Co.*, 74 Nev. 6 (1958); *Rochell* v. *Moore-Handley Hardware Co.*, 239 Ala. 555 (1940). It is suggested (with affidavit support) that the indemnification wording shows the defendant intended to benefit Steir. That is true in a sense, but it is not inconsistent with an intention to benefit the plaintiff, and one rather clearly expressed.[22]

We observe that our holding that the plaintiff has a locus standi on the facts disclosed by no means assures it ultimate recovery. As noted, the defendant in its answer has set out a number of defenses including the alleged illegality of the provision sued on, and its alleged procurement through misrepresentations. We do not reach the question of the soundness of any of the defenses or of their availability as against the plaintiff. See Restatement (Second) of Contracts § 140 (Tent. Drafts Nos. 1-7, 1973); 4 A. Corbin, *supra* at § 818. Cf. *Merrill* v. *Prebuilt Co.*, 329 Mass. 166 (1952).

3. *Conclusion.* The summary judgment for the defendant will be reversed. We leave undisturbed the order

---

*Seargeant* v. *Commerce Loan & Inv. Co.*, 77 Ariz. 299 (1954); *Freer* v. *J. G. Putnam Funeral Home, Inc.*, 195 Ark. 307 (1937); *Weld* v. *Carey*, 122 Kan. 666 (1927); *Stephens* v. *Great S. Sav. & Loan Ass'n*, 421 S.W.2d 332, 336 (Mo. Ct. App. 1967); *Werner* v. *Kent Parking Garage, Inc.*, 133 N.J.L. 104 (1945); *Kreimer* v. *Second Fed. Sav. & Loan Ass'n*, 196 Pa. Super. 644 (1969); *Republic Nat'l Bank* v. *National Bankers Life Ins. Co.*, 427 S.W.2d 76, 81 (Tex. Civ. App. 1968); *Acoustics, Inc.* v. *American Sur. Co.*, 74 Nev. 6 (1958).

[22] The ramifications of "intention" are pursued in Note, Third Party Beneficiaries and the Intention Standard: A Search for Rational Contract Decision-Making, 54 Va. L. Rev. 1166 (1968); Note, The Third Party Beneficiary Concept: A Proposal, 57 Colum. L. Rev. 406, 408-410 (1957).

denying the plaintiff's motions to substitute, as those motions were evidently made on the assumption, arguendo, that the plaintiff could not itself maintain the action, and the assumption is now held incorrect.[23] The judgment against the plaintiff on the bond obligation was based on the judge's supposition that the preliminary injunction had been improperly issued because the whole action must fail; as the action stands, that judgment will be vacated. That should not be taken automatically to reinstate the preliminary injunction. The plaintiff, if so advised, may reapply for interlocutory relief which should be considered in the light of this opinion and the facts as they may then appear.

*Judgment accordingly.*

[23] Rights, if any, of the plaintiff, as third-party beneficiary, or of the defendant, as promisor, to join Steir, as promisee, of course were not tested (nor was the right of Steir to intervene in the action). It may be convenient, where possible jurisdictionally and under procedural rules, to have all three sides represented in the law suit. See note 4 *supra*; the views of Lord Denning are criticized in 1 J. Chitty, Contracts 1117 (24th ed. 1977).