Michael COHEN, et al., Plaintiffs,

v.

Richard D. HATHAWAY, et
al., Defendants.

Civ. A. No. 83–4087–C.

United States District Court,
D. Massachusetts.

Sept. 25, 1984.

**580**

Neal S. Weinstock, Dedham, Mass., for plaintiffs.

John R. Jennings, Wrentham, Mass., for defendant R.D. Hathaway.

Ivo Meisner, Montgomery, Meisner, Reynolds & O'Brien, Edgartown, Mass., for defendant Vineyard Conservation Soc., Inc.

John H. Montgomery, Jr., Montgomery, Meisner, Reynolds & O'Brien, Edgartown, Mass., for defendant Martha's Vineyard Nat'l Bank.

Kathryn M. Bettencourt, Edgartown, Mass., for defendant Dukes County Sav. Bank.

## OPINION

CAFFREY, Chief Judge.

This is a civil action brought by plaintiffs Michael Cohen, a New York resident, and A.B.D. Sword, Inc. ("Sword"), a Delaware corporation, against defendant Richard D. Hathaway, a Massachusetts resident. The subject matter of this lawsuit is the sale of certain property, namely a vessel named "America," from plaintiffs to defendant. Plaintiffs assert in their complaint that defendant has breached the sales contract and defaulted on three promissory notes payable to plaintiffs. Plaintiffs seek payment on the notes, plus interest, costs and attorneys fees. Defendant has filed counterclaims for breach of implied warranties. He requests damages and other appropriate relief.

This case was tried without a jury on June 21, 1984. Plaintiffs offered the testimony of two witnesses: Michael Cohen and William P. Aikens, president of Sword. Defendant also presented two witnesses: Richard Hathaway and Peter Jackson, an Edgartown, Massachusetts landscaper. Plaintiffs offered six exhibits and defendant introduced three. Both parties have filed proposed findings of fact and rulings of law.

Based on the testimony and exhibits offered at trial, I make the following findings of fact. Plaintiff Michael Cohen was a commercial fisherman at Long Island, New York, who owned the vessel "America" for three years. In March 1981, he sold the "America" to Sword. Sword purchased the vessel with the intention of rigging it for swordfishing. The purchase price was $37,500.00. Plaintiff Cohen received $10,000.00 in cash and the remainder in promissory notes.

William P. Aikens, president of Sword, inspected and tested the vessel prior to purchasing it. Also, as is standard business practice, he engaged a marine surveyor Chuck Blume, to survey the vessel. A survey was needed to acquire insurance once the "America" was purchased. Aikens determined, on the basis of his inspection and the report of the surveyor, that the "America" was in good condition and was "sailable," though it needed certain cosmetic work. Aikens purchased the "America" and sailed it to Lewes, Delaware, where work was performed on it for the next two months. The vessel was, among other things, reconditioned, sandblasted, refastened and recaulked; the decks and topsides were redone and new antifouling paint was applied. The completed written survey, dated April 13, 1981, reflected this work performed on the "America." In his final remarks, Mr. Blume wrote:

> In this surveyor's opinion, ... at the time of the survey, [the] vessel ["America"] appeared sound, clean and in good order. [The] vessel has been overhauled and can be considered a good fire and maritime risk. Estimated present market value [is] $50,000.00.

Sword used the vessel for commercial fishing. The evidence shows that the "America" performed well for Sword and that Sword encountered no major problems with the "America" during the time it owned her. Sword did, however, experience financial problems and was unable to make the required payments on the note to Cohen. Aikens decided to sell the vessel. He listed the "America" with a broker, the Karp Marine Agency ("Karp"), in September 1981, and an advertisement was placed in the National Fishermen Magazine by Karp, advertising the vessel for sale as follows:

57' Stonington Wood Longline, 6/71, hyd. hauler, electronics, fishing daily, new gear, with winch, nets, doors ........ $55,000.00

Sword continued to fish with the "America" until November 1981. For the following few months, while the "America" sat unused, Sword had her rigged for crabbing.

Defendant Hathaway saw the advertisement and became interested in the "America" in early 1982. Hathaway was a fisherman at the time and already owned a twenty foot boat. He telephoned Karp, and then travelled to Delaware with a friend, Peter Jackson, to inspect the vessel. At that time, the vessel was located at a marina slip. The "America" was sitting in water the depth of which was just great enough to allow one to move the vessel in and out of the slip at low tide. Hathaway and Jackson went with Karp to the vessel in the evening and took a cursory look. The next morning, Aikens took Hathaway and Jackson to the "America" and they inspected her at the slip. Hathaway and Jackson noticed a little water in the bilges, but were otherwise pleased with what they saw. The engine was already running when they arrived, but they did not take the "America" out for a test sail. They did not attempt to have the vessel hauled, nor did they have a surveyor inspect the "America." Aikens showed the two men the Blume survey and explained that the survey had been recently done and that procuring insurance was no problem. Ai-

kens never told Hathaway that, contrary to the advertisement, the vessel had not been fishing daily for many months.

Relying on the Blume survey, the contents of the Karp advertisement, and his own limited observations, Hathaway decided to purchase the "America." A purchase price of $52,000.00 was agreed upon and Karp made arrangements for the sale to occur at Long Island, New York, on March 30, 1982. Cohen was present at the meeting and was a party to the transaction because it was learned that the bill of sale from Cohen to Sword had never been properly registered and, therefore, Cohen still remained the owner of record of the "America." Cohen signed the bill of sale to Hathaway. Hathaway gave $15,000.00 to Sword. In addition to the money paid, Hathaway signed a note for $10,735.00 payable to Cohen ("Note A"), and two notes payable to Sword, one for $8,015.00 ("Note B") and one for $18,750.00 ("Note C"). Each of these notes required payments of interest to commence on May 1, 1982, with interest accruing at the rate of 15% per annum. Note A and Note B were to be paid in full by January 15, 1983, and Note C by January 15, 1984.

After the closing, Aikens and an employee of Sword transported Hathaway and Jackson down to Lewes, Delaware. Hathaway and Jackson arrived at the dock on April 1, 1982, with the intention of assuming control of the vessel. The engine was already running when Hathaway and Jackson took control of the vessel. Jackson, who has fourteen years of sailing experience, acted as skipper of the "America" when the two set sail from Delaware. The weather at the time was less than favorable, though Hathaway and Jackson left Delaware before the storm which was anticipated arrived.

Approximately thirty miles offshore of Atlantic City, New Jersey, and six hours into the trip, Hathaway and Jackson encountered problems with the "America." The bilge pump stopped working and the vessel began taking on significant amounts

of water. Hathaway and Jackson had to call the Coast Guard for aid. The "America" was towed into Atlantic City by the Coast Guard. The Coast Guard gave Hathaway a citation because the "America" did not have the safety equipment required by law.

Hathaway telephoned Aikens and Aikens, Cohen and employees of Sword went to New Jersey to assist the new owner. The vessel was in Atlantic City for a number of days. The water was pumped out and the vessel was hauled, and then re-hauled, to prevent further leaking. Also, certain equipment, such as the generator had to be replaced. Hathaway then sailed the "America" to Massachusetts where further work was done on the vessel to put it in good sailing condition.

Once the "America" was in good shape, Hathaway took it out on a fishing trip. Hathaway's attempt to fish with the "America" was frustrated, however, when the winch used to haul the nets broke off. This defect also had to be remedied. Hathaway used the vessel for fishing only one other time, in July, and he made $600.00. Hathaway has not fished with the vessel since that time because it requires further work to make it a good, safe fishing vessel.

Hathaway submitted to the Court the bills for the work performed on the "America." The bills reflect a total of $7,931.57. Hathaway testified at trial that the vessel still required work. Specifically, he testified that it needed a new propellor which would cost $3,000.00.

Because of the problems he has had with the vessel, Hathaway has not made the required payments on the notes to Cohen and Sword. Hathaway made an interest payment of $134.00 to Cohen in July 1982. No other payments of interest or principal have been made. Hathaway made one interest payment of $334.00 to Sword in July 1982 and has made no other payments of interest or principal to Sword.

■ Preliminarily, the Court must determine the law to be applied to these facts. Defendant suggests in his answer to plaintiff's complaint that this is a suit in admiralty. Suits in admiralty are governed by federal substantive and procedural law. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). Most courts have held, however, that contracts to purchase a vessel are outside admiralty jurisdiction. *See, e.g., CTI—Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377 (2d Cir.1982). Accordingly, I rule that this is not an action in admiralty, but an action at law. As such, it is to be governed by state law.

■ The question then becomes whether the law of Massachusetts, the law of New York, or the law of Delaware applies to this case. Plaintiffs assert in their proposed findings of fact and conclusions of law that the law of Massachusetts applies. I rule that it would be inappropriate to apply Massachusetts law to this case because the only connection the Commonwealth has to this dispute is that the defendant resides here. This contact alone is not enough. Under the traditional choice of law test, New York law would apply because New York is the place where the contract was made. *Cameron v. Gunstock Acres, Inc.*, 370 Mass. 378, 381–82, 348 N.E.2d 791 (1976). The Massachusetts Supreme Judicial Court has noted, however, that "reference to the law of the place of making can produce awkward or arbitrary results where that place had no or little other connection with the contract or the parties...." *Choate, Hall & Stewart v. SCA Services, Inc.*, 378 Mass. 535, 541, 392 N.E.2d 1045 (1979). Under the facts of this case, New York has little other contact with the transaction other than that it was the place of making and plaintiff Cohen resides there. Sword, the second plaintiff, is a Delaware corporation. Moreover, the contract was primarily negotiated and performed in Delaware. Further, the subject matter of the contract, the vessel "America," was located at nearly all relevant times in Lewes, Delaware. For these reasons, I rule that the law of Delaware applies to this case. *See* Restatement (Second) of Conflicts of Laws § 188 (1971);

*Choate, Hall & Stewart v. SCA Services, Inc.*, 378 Mass. 535, 540–41, 392 N.E.2d 1045 (1979); *Pevoski v. Pevoski*, 371 Mass. 358, 358 N.E.2d 416 (1976).

I turn now to the claims brought in this lawsuit. Plaintiffs claim that defendant has breached the sales contract and defaulted on three promissory notes payable to plaintiffs Cohen and Sword. Plaintiffs seek a ruling by this Court that defendant is liable to Cohen in the amount of $10,-735.00 in principal plus interest at 15% per annum, or an additional $3,863.25, for a total of $14,598.25. Plaintiffs seek a second ruling by this Court that defendant is liable to Sword in the amount of $26,765.00 in principal plus interest at 15% per annum, or an additional $9,632.04, for a total of $35,397.04. Defendant does not dispute his liability on the notes. Rather, he counterclaims for damages which would offset all, or at least a portion, of defendant's liability on the promissory notes. Accordingly, I rule that defendant is liable to Cohen on Note A in the amount of $14,598.25. I further rule that defendant is liable to Sword on Notes B and C in the amount of $36,397.04.

■ The Court must now consider defendant's counterclaims to determine to what damages, if any, defendant is entitled. Although the parties stipulate that the bill of sale from Cohen to Hathaway contained no express warranties, defendant alleges that the plaintiffs breached certain implied warranties. Defendant's first counterclaim is for breach of the implied warranty of seaworthiness of a vessel. While an implied warranty of seaworthiness of a vessel does not exist per se, defendant asserts, in essence, that plaintiffs have breached an implied warranty of merchantability. Del.Code Ann.Tit. 6 § 2–314 (Uniform Commercial Code). Title 6 § 2–314 of the Delaware Code provides, in relevant part:

> ... a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind ....

To recover under this section, defendant must prove by a preponderance of the evidence that plaintiffs Cohen and Sword were merchants with respect to fishing vessels at the time of the disputed transaction. I rule that the defendant has failed to meet his burden of proof. I find that the evidence at trial shows that, at the time of the sale, Cohen and Sword were each in the commercial fishing business and that there was no evidence that they were vessel merchants. I rule therefore that no warranty of merchantability should be implied in the sales contract between Cohen and Hathaway for the vessel "America." I rule that plaintiffs are entitled to judgment on defendant's counterclaim count 1.

■ Defendant's second counterclaim is for breach of the implied warranty of fitness for a particular purpose. Title 6 § 2–315 of the Delaware Code provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is ... an implied warranty that the goods shall be fit for such purpose.

To establish the existence of a warranty under § 2–315, then, plaintiff must prove by a preponderance of the evidence the following elements: first, that the seller had reason to know any particular purpose for which the goods are required; second, that the seller had reason to know that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods; third, that the buyer in fact relied upon the seller's skill or judgment. Unlike § 2–314, § 2–315 does not require that the seller be a merchant. "Although normally the warranty will only arise where the seller is a merchant with the appropriate 'skill or judgment,' it can arise as to non-merchants where this is justified by the particular circumstances." Uniform Commercial Code § 2–315, Comment 4.

■ After considering the circumstances of this case, I rule that this is an appropriate situation in which to imply a warranty

of fitness for a particular purpose. First, the evidence at trial showed that plaintiffs had reason to know that Hathaway was purchasing the "America" for the particular purpose of fishing with it. "[T]he buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists." U.C.C. § 2–315, Comment 1. At the time of the transaction, Hathaway was a fisherman who owned a small fishing vessel. He became interested in the "America" when he saw the advertisement describing the vessel as "fishing daily," with a "hyd[raulic] hauler, ... new gear, with winch, nets and doors." Though there was no evidence that Hathaway specifically told plaintiffs that he intended to use the vessel as a dragger, proof of actual knowledge by the seller of the buyer's intended purpose is not required. Plaintiffs had reason to know from the circumstances that Hathaway bought the "America" for use as a fishing vessel.

Second, defendant proved at trial that the plaintiffs had reason to know that Hathaway was relying on plaintiffs' judgment to sell him a vessel suitable for fishing. Plaintiffs were aware that Hathaway and his friend Jackson examined the vessel on two occasions, but that they did not perform a thorough examination. Plaintiffs offered Hathaway the Blume survey and represented that it was an expert's recent evaluation of the condition of the vessel. Plaintiffs knew that Hathaway did not, thereafter, have a survey done prior to buying the "America." Plaintiffs also did not disclose to Hathaway that the description contained in the magazine advertisement was no longer accurate. Plaintiffs portrayed the "America" to Hathaway as a newly-refurbished fishing vessel that was fishing daily at the time of the sale. These circumstances plainly indicate that plaintiffs had reason to know that defendant was relying on plaintiffs' judgment with respect to the vessel.

Third, the evidence presented at trial demonstrates that Hathaway did, in fact, rely on the plaintiffs' judgment. Defendant himself testified that he so relied, and his testimony is supported by the circumstances surrounding the sales transaction, which were discussed above. Accordingly, I rule that defendant has proved all three required elements.

■ The next question is whether plaintiffs breached the implied warranty of fitness for a particular purpose. · The evidence at trial showed that the "America" was not suitable for fishing at the time it was purchased. The vessel began to sink within six hours of its leaving Delaware under the control of the new owner. The vessel required extensive work before it was in a safe sailing condition. Furthermore, even when the vessel was ready to sail, the equipment used to fish did not function properly and had to be repaired. On the basis of these facts, I rule that defendant has proved that plaintiffs breached the implied warranty of fitness for a particular purpose.

The final issue with respect to this counterclaim is damages. Defendant must prove the damages resulting from plaintiffs' breach by a preponderance of the evidence. Defendant has submitted to the Court bills for work performed on the vessel totalling $7,931.57. Defendant Hathaway also testified that the vessel would need a new propellor costing $3,000.00 before it would be in good shape to fish. Defendant's documentary and verbal proof with respect to damages was not rebutted by plaintiffs. Accordingly, I rule that defendant has proved that, as a result of plaintiffs' breach, he suffered damages in the amount of $10,931.57. This sum is to be divided into two equal parts and offset against defendant's liability to each of the two plaintiffs.

■ In his third counterclaim, defendant seeks punitive damages for the breaches of implied warranties which he sets forth in counts I and II. I rule that punitive damages should not be granted in this case.

Del.Code Ann. tit. 6, § 1–106(1) makes clear that relief given under the Delaware Commercial Code is to be limited to compensatory damages, unless additional damages are specifically authorized by some other rule of law. No such law has been found and I rule that the damages which this Court has awarded defendant compensate him fully for plaintiff's breach, and that the defendant is not entitled to any further damages.

Order accordingly.