Kaplan, Mitchell H., J.
INTRODUCTION
In this action the plaintiff, Northgate Healthcare Services Corporation d/b/a Woodbriar of Wilmington (Northgate), seeks to recover sums that it is due for nursing home services provided to Gladys Moores (Gladys) during the period September 2009 through June 2010, when Gladys died. The defendants are Gladys’s son, Richard Moores (Richard), and her daughter, Marjorie Christerson (Marjorie). Northgate alleges that the defendants breached contractual and fiduciary “obligations” to Northgate, are liable to Northgate on a theory of quantum meruit, and converted income from property owned by Gladys that was due Northgate. The case is before the court on the defendants’ motions for summary judgment.
FACTS
The following material facts are undisputed or viewed in the light most favorable to Northgate.
Prior to being admitted to Northgate, Gladys lived in an apartment at 88 Orange Street in Chelsea. Richard lived in another apartment in that building. In 2001, Gladys transferred ownership of that building to Richard, reserving for herself a life estate. While there was a third apartment in the building, it had not been occupied for many years. Gladys’s apartment was not rented when she moved to Northgate. Marjorie lived in Wilmington.
On September 22, 2009, Gladys became a resident of Northgate. On that date, a Massachusetts Resident Admission Agreement (the Agreement) was executed by Northgate and Maijorie, as a “Responsible Party” for Gladys. There is no evidence that a guardian or conservator had been appointed for Gladys. The form Agreement included boxes to check if the “Responsible Party” had any legal or fiduciary relationship with the Resident: none were checked. The Agreement expressly stated: “If the Responsible Party is a relative or friend without fiduciary responsibility for the Resident, unless otherwise agreed in writing, we acknowledge and agree that the Responsible Party is not liable or obligated for any of the charges, costs or expenses described in the agreement. In that case, for the sole purpose of assessing monetary liability, ‘you,’ as used in the agreement, shall refer only to the Resident and not the Responsible Party.” Maijorie was this type of Responsible Party.
Elsewhere the Agreement provides: “By executing this Agreement, the Responsible Party expressly affirms and agrees to pay to the Facility, from funds and resources of the Resident which the Responsible Party holds, maintains, receives or has access to on Resident’s behalf all such resource monies, co-payments and other amounts due to the facility.” There is no evidence in the Summary Judgment record that Maijorie ever told Northgate that she had control over any of Gladys’s funds. To the contrary, Northgate was informed by Maijorie that Richard had custody of Gladys’s checkbook and such financial records as might exist and would receive on Gladys’s behalf her monthly social security and pension checks — $996 in the aggregate.
Although Richard did not sign the Agreement and is not referenced in it, Northgate asked him to complete a Medicaid application for Gladys. It appears that Richard took some steps toward applying for Medicaid on behalf of his mother, but did not adequately complete the process and her application was denied. According to Northgate, Richard told them that he would submit the missing information required by *450 Medicaid, but never did. Northgate’s efforts to complete the application process without additional assistance from Richard were unsuccessful.[1]
In February 2010, Northgate sent Richard an invoice for $3,696.80 for Gladys’s care, which represented what the court understands would have been Gladys’s obligation to Northgate for the months of October through January, if she were determined to be Medicaid eligible. Richard promptly paid that invoice.
There is evidence in the Summary Judgment record that at the time of her admission to Northgate, Gladys’s assets included: approximately $2700 in cash; $7500 in Pfizer stock, but held jointly with Marjorie with a right of survivorship; and her life estate in 88 Orange Street.
DISCUSSION
The legal standards that the court must apply in considering a motion for summary judgment under Mass.R.Civ.P. 56 are well known to the parties and will not be recited here.
Marjorie
The Agreement made clear that as a Responsible Party with no legal obligation to act on behalf of her mother or right to control her mother’s funds, Marjorie “is not liable or obligated for any of the charges, costs or expenses described in the agreement.” Therefore, no claim may be asserted against Marjorie for a contractual failure to pay Northgate’s charges for Gladys’s stay at the nursing home.
The Agreement does provide that: “By executing this Agreement, the Responsible Party expressly affirms and agrees to pay to the Facility, from funds and resources of the Resident which the Responsible Party holds, maintains, receives or has access to on Resident’s behalf all such resource monies, co-payments and other amounts due to the facility.” Arguably, this could create an obligation on the part of Marjorie, as Responsible Party, to pay Northgate any of Gladys’s funds over which Marjorie had dominion or control. There is no evidence in the Summary Judgment record that Marjorie controlled any such funds or that she received any funds from Gladys. To the contrary, Marjorie told Northgate that Richard received Gladys’s social security and pension checks and held her checkbook. And, Northgate sent at least one invoice to Richard.
Finally, as there is no evidence that Marjorie held or received any of Gladys’s funds, she certainly did not convert any of Gladys’s funds to her own use, nor was she unjustly enriched by any such funds.
Richard
Richard did not sign the Agreement in any capacity, nor does his name appear in it. In consequence, Richard clearly has no direct contractual relationship with Northgate. Northgate argues that it can nonetheless enforce against Richard, Gladys’s obligations to it under the Agreement. Northgate cites Choate, Hall & Stewart v. SCA Services, Inc., 378 Mass. 535, 542-48 (1979), in support of its argument. Northgate misreads that decision. There, a party claiming to be a third-party beneficiary (in that case a creditor beneficiary) of a contract between the defendant and another was permitted to sue under the contract. SCA Services certainly does not stand for the proposition that a contract between two parties can cause a stranger to that contract to accept contractual obligations under it, i.e., that two parties can agree between themselves that another party, who has not promised to do anything, will have contractual obligations to either of them.
Northgate also asserts a claim for conversion against Richard. “One who intentionally or wrongfully exercises acts of ownership, control or dominion over personal property to which he has no right of possession at the time is liable for the tort of conversion.” See generally Nolan, Tort Law §35 (1979). It is not clear that there is any evidence in the summary judgment record that Richard did this with respect to any of Gladys’s property. But more to the point, a cause of action for conversion must be brought by the owner of the property which has been converted. See The General Convention of the New Jerusalem in the United States of America, Inc. v. MacKenzie, 449 Mass. 832, 839 (2007). The fact that Gladys was indebted to Northgate for the charges for her care does not make Northgate the owner of Gladys’s cash or property; it makes Northgate Gladys’s, and subsequently her estate’s, creditor. The law provides mechanisms for a creditor to bring an action against an estate, even when the next of kin of a person dying intestate declines to take steps to administer the estate. See 21 Mass. Prac., Probate Law and Practice §20.3 (2d ed.) and White v. Cormier, 311 Mass. 537, 539 (1942).
Finally, Richard is also not liable to Northgate on a theory of quantum meruit for his mother’s care, or on any other quasi-contractual theory of recovery. To succeed on a claim of quantum meruit against Richard, Northgate must demonstrate that it conferred a benefit on Richard, that Northgate reasonably expected Richard to pay for it, and Richard reasonably expected to pay Northgate for it. See Salamon v. Terra, 394 Mass. 857, 859-60 (1985) (where both parties understood that a third party would pay for houses built on the defendant’s land). In this case, neither Northgate nor Richard reasonably expected Richard to pay for his mother’s nursing home care.[2]
The summary judgment record suggests legitimate frustration on the part of Northgate at Richard’s failure diligently to do what was required to complete Gladys’s Medicaid application, as it seems likely that Gladys’s application would have been approved if fully completed. One could argue that, under the circumstances, Richard had an ethical obligation conscientiously to work with Northgate through the *451 application process. Richard, however, did not contractually obligate himself to do anything, and the court cannot enforce moral obligations that do not fall within the reach of a recognized legal obligation. To the extent that Northgate believed that there was some fraudulent transfer of Gladys’s funds, there are causes of action that exist to recover such funds for a creditor, but none were pled in this case.
ORDER
For the foregoing reasons, the defendants’ motions for summary judgment are allowed. Final judgment shall enter dismissing this case.

 Richard denies that Northgate followed up with him regarding the missing information needed to complete the Medicaid application. For purposes of this motion for summary judgment, Northgate’s version of these events is assumed to be true.

 It is also not clear that providing nursing home care to Gladys constitutes a benefit conferred on Richard, at least not one that the law recognizes. The position of an adult son may be distinguished from that of a spouse who might have an obligation to pay for necessary services, including those provided by a nursing home. See G.L.c. 209, § 1 and Mediplex of Massachusetts, inc. v. Donovan, 1994 Mass.App.Div. 123.