John E. MASSENGALE, Trustee,
Plaintiff, Appellant,

v.

TRANSITRON ELECTRONIC CORPORATION, Defendant, Appellee.

No. 6919.

United States Court of Appeals
First Circuit.

Nov. 13, 1967.

Robert Braucher, Cambridge, Mass., with whom Harold Katz, Boston, Mass., was on the brief, for appellant.

Harold M. Willcox, Boston, Mass., with whom Ann S. Dodge and Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., were on the brief, for appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is an appeal from a summary judgment entered for appellee in a diversity action in which appellant sought a brokerage fee from a putative buyer of a business who allegedly wrongfully withdrew from a purchase agreement appellant had initiated on behalf of the seller. The purchase agreement obligated the buyer to pay the broker "if and when" the transaction was consummated.

Appellant's assignors were the sole stockholders of McClellan and Burck, Inc. (Burck), a now dissolved New York corporation once engaged in the business of identifying and effecting mergers, acquisitions, sales and financing arrangements for its clients. During the years 1958 through 1961 it undertook some twenty acquisition and merger explorations for a Minnesota firm, Thermo King Corporation (Thermo King). This case arises from events which took place in 1960 when Burck had located two companies interested in acquiring Thermo King—Westinghouse Electric Corporation and appellee, Transitron Electronic Corporation (Transitron), a Delaware corporation having its principal place of business in Massachusetts.

For the purposes of establishing the basis of its compensation and providing a document for use in negotiations between Thermo King and either of the two prospects, Burck sent a letter on July 11, 1960 to Thermo King. According to the terms of this letter, Burck's compensation, " * * * in the event * * * a transaction is consummated with any company where our firm has originated the transaction", was to be computed on the basis of percentages of the sales price with a ceiling of $325,000 and was to be payable at the closing. The assumption was expressed that arrangements would be made for the acquiring company or the combined company to pay the fee, " * * * but in the absence of such an arrangement, the obligation shall be that of Thermo King Corporation." Thermo King noted its agreement with these terms subject to the condition that the acquiring company approve the amount of the fee.

A month later, on August 16, 1960, when negotiations had focussed on Transitron, Burck sent another letter to Thermo King stating its willingness to accept a reduced fee of $300,000 " * * to be due and payable when and if the proposed transaction with Transitron * * * is consummated." Burck noted its understanding that Transitron had approved the amount of its fee and that arrangements had been made with Transitron for payment. The reduction in fee was to apply only to a Transitron transaction.

On October 29, 1960, Thermo King and Transitron entered into an "Agreement and Plan of Reorganization" for the acquisition of all of Thermo King's business subject to its liabilities and in exchange for shares of Transitron stock. Upon transfer of its assets, Thermo King

was to be promptly dissolved and the Transitron stock distributed to its shareholders. The mutual undertakings were conditioned on the accuracy of various stated representations and warranties and on the taking of necessary corporate actions (e. g., a vote by Thermo King stockholders adopting the plan). Each party agreed to "use its best efforts" to comply with all conditions. The agreement's clause relating to commissions read as follows:

> "Transitron and Thermo King each represents that neither of them has retained any broker or paid or agreed to pay any brokerage fee or commission to any agent or broker for or on account of the transactions herein contemplated, except that Thermo King has agreed to pay a fee of $300,000 to Messrs. McClellan & Burck, Inc. of New York, New York, in the event that the said transactions are consummated, but not otherwise. Such fee shall be paid by Transitron if and when such transactions are effected."

The agreement also provided that it should be "governed by Minnesota law."

On December 19, 1960 Transitron sent Thermo King a notice terminating the agreement on the grounds of a material adverse change in Thermo King's business and the failure of Thermo King to call a stockholders' meeting. On December 22, 1960, Burck wrote Westinghouse in an effort to revive its interest, stating that the transaction had aborted because of a precipitous drop in the market value of Transitron's stock, which eroded Thermo King's price by almost 40 per cent.

On June 30, 1961, Thermo King entered into another "Agreement and Plan of Reorganization", this time with Westinghouse. A clause in the new agreement provided for commissions substantially identical to that in the Transitron agreement except that the fee was stated to be $325,000 and there was no sentence in-

dicating that Westinghouse would pay it. The transaction came to fruition on August 14, 1961 at which time Thermo King paid Burck $325,000.

Several years later this suit was brought to recover the $300,000 fee allegedly earned in the Transitron matter. The complaint alleged that Transitron's December 19, 1960 notice of termination was " * * * without cause or justification but was a wrongful and willful breach of its Agreement with Thermo King and a violation of its obligations to [Burck] * * * " and that Transitron " * * * wrongfully prevented the effecting and consummation of the transaction." The taking of depositions, sought by appellant to establish the invalidity of the grounds for termination asserted by Transitron, was stayed pending disposition of Transitron's motion for summary judgment.

The district court first faced the choice of law issue and ruled that Massachusetts, the forum state, would honor the contract provision that Minnesota law govern. We agree. Maxwell Shapiro Woolen Co. v. Amerotron Corp., 339 Mass. 252, 257, n. 1, 158 N.E.2d 875 (1959); Restatement (Second) of Conflict of Laws §§ 332(2), 332a and 346 (Tent. Draft No. 6, 1960). On appeal appellee urges upon us that Massachusetts law must nevertheless govern where the question involves a right asserted by a stranger to the contract. The cases cited to us in support of this contention are inapposite and our own research has unearthed no Massachusetts authority directly on point. We feel certain, however, from our reading of such cases as *Amerotron* that the Massachusetts courts would follow the proposed Restatement rule which allows parties to a contract to stipulate reasonably the governing law not only as to questions of validity but as to the nature and extent of rights and duties as well. Restatement, supra at § 346.[1] And we are confident that to ap-

---

1. Comment c to § 346 reads as follows:
   "*Third party beneficiary.* The law selected by the application of the rule of this Section determines whether or nor [sic] a third party beneficiary obtains enforceable rights under the contract."

ply the laws of Minnesota in this context, including its recognition of third party beneficiary claims, does not offend substantial Massachusetts public policy. Restatement, supra at § 332(a), comment g.

Applying Minnesota law, the court concluded that the rights of a third party beneficiary are limited strictly by the terms of the contract under which he claims and that Burck's allegations did not bring it within the terms of the Thermo King-Transitron agreement. Accordingly, it granted appellee's motion for summary judgment, reasoning, first, that Transitron's obligation was "derivative from and co-extensive with Thermo King's promise to [Burck] in the letter of agreement of July 11, 1960 which was conditioned upon consummation without qualification" and, second, that Transitron's own direct undertaking in the commissions clause of its contract was to pay Burck " * * * if and when such transactions are effected."

The court held that Burck's rights were not enlarged beyond the express limitations in the contract by the principle of such cases as Huntley v. Smith, 153 Minn. 297, 190 N.W. 341 (1922) and Flower v. Davidson, 44 Minn. 46, 46 N.W. 308 (1890), which allowed recovery to a broker of a fee contingent on consummation when his seller-principal arbitrarily refused to consummate a transaction. Noting that it knew of no Minnesota case extending this principle to a third party beneficiary, the court refused to extend *Huntley* and *Flower* to this case where the buyer allegedly refused to consummate. It reasoned that here, unlike the fact situation in the cited cases, there was no engagement of the broker by Transitron, no rendering of valuable services under such an engagement, and no relationship apart from the Thermo King-Transitron contract. The court further found a significant distinction between a contract requiring, as in *Huntley* and *Flower*, only consummation and one, as here, requiring such specified measures as a stockholders' meeting in addition to consummation. It deemed the

"best efforts" undertaking of Thermo King and Transitron to be reciprocal only and noted the absence of any such language in the fee agreement between Thermo King and Burck.

As a second and independent ground for decision, the court held that Thermo King's payment to Burck of the $325,000 fee for the Westinghouse transaction discharged any obligation to Burck which Transitron might have had. Its chain of reasoning was (1) that Transitron's only promise was to assume Thermo King's obligation to Burck under the letter of agreement; (2) that Burck had only one fee agreement with Thermo King in the event of a consummated transaction "with any company"; and (3) that therefore Thermo King's payment wiped out the non-severable obligation of both Thermo King and Transitron. As to such cases as Olds v. Mapes-Reeve Construction Co., 177 Mass. 41, 58 N.E. 478 (1900) and Kunkle v. Jaffe, Ohio App., 71 N.E.2d 298, 47 Ohio L.Abst. 77 (1946), holding that a plaintiff's damages are not mitigated in an action against a breaching purchaser of goods or services simply because the plaintiff has been able to sell the goods or services to another, the court held them distinguishable by reason of " * * * the nature of the agreements sued upon and the separateness of the subsequent transactions."

Finally, the court dealt with appellant's alternative theory that Transitron's alleged wrongful action constituted not only breach of contract but tortious interference with the relationship between Burck and Thermo King. It found no allegation or evidence that Transitron intentionally caused loss by interfering with a business or contractual relationship.

 Our disagreement on the first two grounds makes it unnecessary to consider this latter theory—whether tortious interference has been sufficiently alleged and, if so, whether such cause is barred by the statute of limitations applicable to torts. In registering our contrary views, we acknowledge that we

are acting in the rarefied atmosphere of rulings on motions for summary judgment. Our only pertinent inquiry must be whether, on the pleadings, depositions, affidavits, and exhibits, there exists a fact in dispute which is material. Our search is not for likelihoods or probabilities, but for possibilities within a fairly wide range of remoteness. With this perspective, therefore, we must, for the purposes of deciding the issue presented by the motion for summary judgment, assume that Transitron terminated the Agreement and Plan of Reorganization without any justifiable basis.

■ Taking this view of the case, we cannot say that Burck has advanced no cause of action. Appellee acknowledges that Minnesota law confers upon a third party beneficiary the right to assert such claims against a promisor as he has against a promisee. The district court recognized this when it declared that Transitron's obligation to Burck was coextensive with Thermo King's. Appellee implicitly and the court explicitly accepted the principle of La Mourea v. Rhude, 209 Minn. 53, 295 N.W. 304 (1940). But both failed to pursue the implications of this landmark case.

The court read La Mourea as merely giving Burck the right to maintain an action, without shedding light on the nature of its rights. It therefore, as we have noted, refused to apply Huntley v. Smith, supra, and Flower v. Davidson, supra, because " * * * in this case [Burck] and [Transitron] had no relationship apart from the Transitron-Thermo King agreement." In similar vein appellee relied heavily on Kramer v. Gardner, 104 Minn. 370, 116 N.W. 925, 22 L.R.A.,N.S., 492 (1908), which held that a promise by the purchaser of a business to a second mortgagee to pay off the first mortgage gave no rights to

the first mortgagee, there being no privity between the two mortgagees, no obligation on the part of the second mortgagee to the first mortgagee, nor any consideration moving from the beneficiary (first mortgagee) to the promisor.

Leaving aside the factual differences between Kramer and the case at bar, La Mourea specifically overruled the "outmoded" doctrine of Kramer v. Gardner and in so doing, dealt fatal blows to the traditional concepts of both consideration and privity. As to the former concept, it said, " * * * it is no objection to an action on the contract by a donee or creditor beneficiary that he did not furnish any of the consideration." 295 N.W. at 306. As to the latter, it said:

"Privity, in the law of contracts, is merely the name for a legal relation arising from right and obligation. For example, A, by contract, secures a promise from B. A may transfer his right of enforcement to C. C thereby succeeds to A's right of action, and, in consequence, comes into the relationship with A and B which we call privity of contract. Instead of waiting to do it by assignment, A may, at the outset, exact from B the same promise in favor of C. It is enforceable by C, who thereby has come directly into legal relationship with B." 295 N.W. at 307.

La Mourea was not an accident. It was foreshadowed by the concurring opinion of Justice Royal Stone in Peterson v. Parviainen, 174 Minn. 297, 219 N.W. 180 (1928), who, twelve years later, wrote the opinion in La Mourea for a unanimous court. See de Werff, Third Party Beneficiary Contracts in Minnesota, 29 Minn.L.Rev. 436, 441–45 (1945).[2] See also 25 Minn.L.Rev. 523

---

2. We are told that in the valedictory of Justice Stone, his last opinion—a dissent —he wrote of the third party beneficiary contract doctrine: "It illustrates the fact that the common law is not a matured, rigid, and inert mass. It is rather a live and growing organism, self-adapting to new problems and new truths. While avowing respect for precedent, it owes no allegiance either to ancient error or any concept invalidated by progress." Farmers State Bank v. Burns, 212 Minn. 455, 472, 5 N.W.2d 589, 591 (1942), quoted in 29 Minn.L.Rev., supra at 436, n. 3.

(1941); Mitchell v. Rende, 225 Minn. 145, 147, 30 N.W.2d 27, 29 (1947).

■ To use the language of *La Mourea*, Burck in the case before us "has come directly into legal relationship with" Transitron. This is no surprise to anyone, for Burck drafted its fee agreement letter knowing it would be shown to the acquiring company; Thermo King accepted the fee agreement only on condition that Transitron approve; in fact subsequent discussions between Thermo King and Transitron resulted in a reduction in fee for that transaction; and Transitron in its contract with Thermo King assumed the obligation to pay Burck's commission. But, apart from the express characterization of the direct relationship just quoted, the entire import of *La Mourea* is that, regardless of such labels as "consideration" and "privity", Transitron stands in the same position toward Burck as does Thermo King. The district court, while formally accepting this concept in referring to Transitron's obligation as "co-extensive" with Thermo King's, for all practical purposes diminished it by applying traditional concepts of consideration and privity when it refused to extend to Transitron the principle that arbitrary refusal to consummate a transaction could mature its obligation as fully as could consummation.

■ This principle is to be distinguished from the undertaking by Thermo King and Transitron in their contract to use "best efforts" to bring about the transaction. We do not reach the issue whether, as the district court said, this obligation was reciprocal only, for there is a large difference between the positive duty to use best efforts and the negative duty to refrain from termination for unjustifiable cause.

■■ On what basis of reason should there be a difference between the liability of a seller and a buyer, each of whom had undertaken to pay a brokerage fee in the event of consummation and each of whom wrongfully refuses to consummate a transaction? Or, to put it more concretely, why should Thermo King be obliged to pay Burck if it captiously aborted the transaction while Transitron would be under no such obligation for the same conduct leading to the same result? We cannot see any basis—other than "privity"—for making a distinction.[3] Nor can we see the distinction drawn by the district court between a fee agreement contingent on "consummation" and one contingent on specified preconditions to consummation as well as final consummation itself. This is not like Chapman v. Merchants Trust Co., 184 Minn. 467, 239 N.W. 231 (1931), relied upon by the district court, where a broker was held not entitled to a fee when he had produced a customer who entered into negotiations for a loan from a bank. The court in that case, finding that the bank had "reserved full liberty of action, including the right to refuse to make the loan upon any ground whatsoever", concluded that no contract of any kind was executed between the principal and customer. Such a case would be pertinent here only if Transitron had not entered into a contract with Thermo King. To attempt to equate such steps as the holding of a stockholders' meeting to ratify a planned transaction with the making of a loan to which one was never committed would be to say that a promisor can safely refuse, without reason, to perform all steps under a contract except the final closing.

We recognize that the Minnesota courts, so far as we are aware, have not had occasion to rule on the obligation of an arbitrarily defaulting promisor to a third party beneficiary in such a case as that at bar. But we feel that they would today be constrained to recognize a cause

3. That a broker's right to his commission should not turn on whether the sale falls through because of the default of the seller or buyer seems clear from Blanken v. Bechtel Properties, Inc., 194 F.Supp. 638 (D.D.C.1961) in which Judge Holtzoff thoughtfully reviews a wide range of authorities, citing, among others, Restatement (Second) of Agency § 445, comment d, ill. 1, and 4 Williston, Contracts § 1030A (1936).

of action.[4] The most pertinent case that has been cited to us is Chipley v. Morrell, 228 N.C. 240, 45 S.E.2d 129 (1947), where, on demurrer, a broker hired by a seller, was held entitled to sue an arbitrarily reneging buyer despite the absence of any undertaking to pay the fee on the part of the buyer. This case is, a fortiori, persuasive authority for that at bar since we have here an explicit undertaking by the buyer to pay the fee. Appellee seeks to distinguish *Chipley* by pointing out that the buyer had deposited $1,000 with the broker, which constituted "a bilateral transaction between the buyer and the broker". We see nothing of the sort; the facts as stated in Lampros v. Chipley, 228 N.C. 236, 45 S.E.2d 126 (1947), a companion case to Chipley v. Morrell and one which precedes it in the reports, make clear that the money so deposited was held by the broker as agent for his principal, the seller. See also, Calhoun v. Downs, 211 Cal. 766, 297 P. 548 (1931); Beckett v. Miller, 110 Kan. 479, 204 P. 539 (1922); Danciger Oil & Refining Co. v. Wayman, 169 Okl. 534, 37 P.2d 976, 97 A.L.R. 854 (1934); and Hartmann v. Windsor Hotel Co., 132 W. Va. 307, 52 S.E.2d 48 (1949).

■■■ The second ground of the district court's decision—that Thermo King's payment for the Westinghouse transaction satisfied any liability of Transitron—is based on the concept that all that was bargained for was one fee for one transaction. In a sense this is true. Prospectively, Burck and Thermo King contemplated only one completed transaction. There obviously could be only one completed merger. But what is alleged by the complaint to have happened is something beyond the contemplation of the parties, i. e., the unjustifiable refusal by Transitron to consummate the first transaction. This, as we have concluded, gives rise to an obligation.

The broker has in such case earned a commission just as if the merger had been completed. When its subsequent services, which it was under no compulsion to render, resulted in a completed transaction, a second commission was earned. This is not, as appellant properly notes, an action against an employer for damages caused by wrongful discharge, in which damages would be mitigated by plaintiff's subsequent earnings.

■■■ In sum, while only one transaction was originally contemplated, the allegedly wrongful withdrawal of Transitron matured one commission-producing occurrence and the completion of the Westinghouse transaction matured another. Appellant therefore does not seek double compensation for a single debt but one payment for each of two separate debts.

Judgment will be entered reversing the judgment of the District Court and remanding the action for further proceedings not inconsistent herewith.

---

4. We are conscious of the fact that both Huntley v. Smith, supra, and Flower v. Davidson, supra, contain dicta that a broker is not entitled to a commission if the failure to complete the sale rested on the purchaser's refusal to carry out the contract of sale. While no un-

derlying reason was given in either case, the concepts of privity and consideration, so unequivocally laid low by *La Mourea*, supra, must have made the proposition appear too obvious to warrant discussion. We cannot believe that these dicta would today be accepted as law in Minnesota.