**NEW ENGLAND MERCHANTS NA-
TIONAL BANK, Plaintiff-Appellee,**

v.

**Coleman R. ROSENFIELD, and Gladys
Rosenfield, Defendants-Appellants.**

No. 77–1627.

United States Court of Appeals,
Fifth Circuit.*
Unit B

July 1, 1982.

* Former Fifth Circuit Case, Section 9(1) of Pub- lic Law 96–452—October 14, 1980.

Gary D. Fox, Alan G. Greer, Miami, Fla., for defendants-appellants.

Gordon N. Schultz, Cyril Hochberg, Boston, Mass., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJOFLAT and THOMAS A. CLARK, Circuit Judges.

TJOFLAT, Circuit Judge:

New England Merchants National Bank of Boston, Massachusetts (New England Merchants), brought this diversity action against Coleman and Gladys Rosenfield, the guarantors of several defaulted promissory notes given the bank by a bankrupt restaurant chain, Mama Tino, Inc. The amount due on the notes, $371,196, was not in dispute, but the Rosenfields denied they were liable to the bank as guarantors. The case was tried to a jury, and at the close of all the evidence the court directed a verdict in favor of the bank. In this appeal, the Rosenfields argue on several grounds that they are entitled to judgment as a matter of law or, alternatively, a new trial. None of their arguments has merit, and we therefore affirm.

I.

In 1968, Nicholas and Pauline Fiorentino and Coleman and Gladys Rosenfield, decided to establish a chain of Italian restaurants. They lacked sufficient capital to fund the enterprise, so they persuaded several investors, including Jessup & Lamont, a New York brokerage firm, to join them.

This group formed Mama Tino, Inc., and the Fiorentinos and the Rosenfields collectively purchased the controlling stock interest in the corporation.[1] Mama Tino's board of directors[2] elected Coleman Rosenfield chairman of the board and treasurer of the company and Nicholas Fiorentino president and chief executive officer. Jessup & Lamont became Mama Tino's financial advisor.

Mama Tino started its restaurant chain in South Florida with eight restaurants.[3] To obtain the funds necessary to construct these restaurants and to provide working capital, Mama Tino borrowed nearly one million dollars from Butlers Bank Limited of Nassau, Bahamas (Butlers Bank), and New England Merchants. This borrowing took place during various stages of restaurant construction and involved a series of promissory notes, some secured by restaurant properties and some unsecured. Mama Tino gave New England Merchants three of the unsecured notes: a $100,000 note due February 2, 1970; a $50,000 note due February 9, 1970; and a $50,000 note due March 9, 1970. Coleman Rosenfield executed each note as chairman of the board.

It soon became apparent that Mama Tino was undercapitalized. To cure this problem, its board of directors asked Jessup & Lamont to arrange a public stock offering. When, after considerable effort, Jessup & Lamont was unable to bring a stock issue to market, Mama Tino was forced to look elsewhere for help.

Coleman Rosenfield and Nicholas Fiorentino contacted Constantinos Philips, assistant vice-president of New England Merchants, and asked that the bank renew

Mama Tino's $100,000 note due February 2, 1970, and its $50,000 note due February 9, 1970; "discount" two of Mama Tino's outstanding secured loans;[4] and lend $50,000 to Mama Tino for working capital. On February 2, 1970, Philips wrote Nicholas Fiorentino stating that the bank would discount the two secured loans and would renew the two notes if the Fiorentinos and the Rosenfields guaranteed all of Mama Tino's indebtedness to the bank; the bank, however, would not lend Mama Tino the additional $50,000 it requested. Philips also stated that each guarantor would have to file a personal financial statement with the bank. Nicholas Fiorentino and Coleman Rosenfield discussed this letter and decided to proceed in accordance with its tenor. On February 6, 1970, Coleman Rosenfield, as chairman of Mama Tino's board of directors, signed a thirty-five day $150,000 promissory note, dated February 2, 1970, payable to New England Merchants, and on February 8, Nicholas Fiorentino hand delivered the note and the required guaranties to the bank in Boston. On February 10, the bank marked paid the Mama Tino notes due February 2 and 9, 1970, and entered the new $150,000 note on its ledger. At this time, Nicholas Fiorentino gave the bank his personal financial statement, but the other guarantors did not.

Mama Tino was unable to obtain from any source the working capital it needed, and it developed a negative cash flow. It did not pay the unsecured notes due New England Merchants in March 1970, and in April, Philips went to Florida to evaluate Mama Tino's financial condition. At an April 9 meeting of Mama Tino's board of directors,[5] Philips learned that the company

---

1. The record does not indicate precisely what percentage of the issued and outstanding shares of Mama Tino, Inc., each of the Fiorentinos and Rosenfields owned.

2. The record does not indicate the size of Mama Tino's board of directors or identify any of the directors other than Coleman Rosenfield, Nicholas Fiorentino and an unnamed representative of Jessup & Lamont.

3. Mama Tino apparently operated its restaurants through wholly-owned subsidiary corpo-

rations. This fact is irrelevant to this appeal; therefore, we will treat Mama Tino as the owner and operator of each restaurant.

4. The record does not identify the obligee of these loans, the terms thereof, or what "discount" meant.

5. The minutes of the April 9, 1970, meeting of the board of directors of Mama Tino were not offered in evidence; nor were the minutes of any other board meeting. Several witnesses testified to what transpired at these meetings,

was technically insolvent and that additional operating funds were not available. Philips repeated to the board what he had written Nicholas Fiorentino on February 2: New England Merchants would make no more loans to the company. Philips also asked the Rosenfields and Mrs. Fiorentino for the financial statements they had neglected to furnish the bank. Mrs. Fiorentino immediately complied, signing her husband's financial statement. But the Rosenfields refused to provide their financial statements until they discussed the matter with their attorney, and, in the end, they never submitted their statements to the bank. Coleman Rosenfield told Philips that his guaranty might not be enforceable, though he did not explain why. Philips consequently had Rosenfield reexecute his guaranty on the spot.

Mama Tino's board of directors thereafter met several times to discuss the company's financial troubles. By April 21, 1970, the board members concluded that unless they immediately raised $50,000 in working capital, the company was headed for bankruptcy. In May, Coleman Rosenfield proposed that Mama Tino raise the $50,000 by selling its surplus real estate and by instituting a damage suit against Jessup & Lamont for failing to perfect a public stock offering.[6] The real estate was not sold, however, and Mama Tino, on June 3, 1970, commenced proceedings in the Southern District of Florida for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq. (1976). On the same day Mama Tino brought a damages action against Jessup & Lamont in Florida state court. The case was soon dismissed, however, because the court lacked personal jurisdiction over Jessup & Lamont.

To protect its financial interest in Mama Tino and to proceed against the Rosenfields and Fiorentinos as the guarantors of Mama Tino's debts, New England Merchants employed a Florida attorney, J. J. Simons. Simons appeared for the bank in the Chapter XI arrangement proceedings, but he refused to sue the guarantors, and so informed them, because the bank had been referred to him by Coleman Rosenfield. New England Merchants thus dealt with the guarantors directly. On June 18, 1970, it contacted Nicholas Fiorentino and offered to refrain from suing him and his wife on the guaranties if he would sue Jessup & Lamont and apply the proceeds of any recovery to Mama Tino's indebtedness to the bank.[7] Fiorentino did not respond to this offer, however, so the bank withdrew it. Some time prior to September 22, 1970, New England Merchants obtained from the bankruptcy court various assets of Mama Tino, including several restaurants, in which the bank held a security interest.[8] The bank then employed Nicholas Fiorentino to aid it in liquidating some of these assets and to operate the restaurants the bank had acquired. As part of this employment arrangement, the bank agreed not to sue Fiorentino or his wife on their guaranties.

New England Merchants did not proceed against the Rosenfields until May 1974, when it demanded that they pay off the balance due on Mama Tino's loans. The Rosenfields refused to pay, and the bank brought this suit in the United States District Court for the District of Massachusetts. The Rosenfields promptly moved for a change of venue pursuant to 28 U.S.C. § 1404(a) (1976); the motion was granted, and the case was transferred to the Southern District of Florida.

however, after referring to the written minutes, on both direct and cross-examination, to refresh their recollections. As a result, there was no material dispute in the evidence as to what took place at any of these board meetings.

6. The record does not indicate the legal theory under which Coleman Rosenfield would have had Mama Tino proceed against Jessup & Lamont.

7. The record does not explain the legal basis of any claim Fiorentino, or Mama Tino, may have had against Jessup & Lamont. We assume that the bank was referring to Jessup & Lamont's failure to bring a Mama Tino stock issue to market. See note 6, supra, and accompanying text.

8. The record contains no additional explanation as to what these assets were or where they were located.

The Rosenfields raised four defenses to New England Merchants' claim that they were liable, as guarantors, for Mama Tino's $371,196 indebtedness to the bank. First, they contended that the guaranties they had executed in favor of the bank had been delivered conditionally: the guaranties were not to take effect unless and until the bank loaned Mama Tino an additional $50,000 for working capital and the Rosenfields and the Fiorentinos gave the bank their financial statements; since neither of these conditions was fulfilled, the guaranties were void. Second, the Rosenfields contended that the bank orally promised to cancel their guaranties if they would cause Mama Tino to sue Jessup & Lamont; the guaranties were thereafter cancelled on June 3, 1970, when Mama Tino sued Jessup & Lamont. Third, the Rosenfields contended that the statement of the bank's attorney, J. J. Simons, that he would not bring suit against the guarantors, released the Rosenfields from any liability to the bank on their guaranties. Fourth, the Rosenfields contended that the bank released them as guarantors when it employed Nicholas Fiorentino to look after some of Mama Tino's assets and agreed not to sue the Fiorentinos on their guaranties. The Rosenfields also counterclaimed, seeking damages from the bank for refusing to lend Mama Tino an additional $50,000 for working capital. This counterclaim was dismissed prior to trial on statute of limitations grounds and is not involved in this appeal.

The case was tried to a jury. At the close of all the evidence, the bank moved for a directed verdict on all issues, and its motion was granted. The district court entered judgment for $371,196, and the Rosenfields took this appeal.

## II.

■ Our first task is to decide what substantive law to apply in this case. The rule of decision in a diversity case is a matter of state law selected under the conflicts of law principles of the state where the district court sits. *Klaxon Co. v. Sten-*

*tor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Where, as here, the case is transferred to another district pursuant to 28 U.S.C. § 1404(a) (1976), the transferee court must apply the conflicts principles of the transferor state unless venue in the transferor state was improper. *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 821, 11 L.Ed.2d 945 (1964). In this case, the District of Massachusetts was a proper venue; therefore, Massachusetts conflicts rules control.

■ To determine the validity of a contract, Massachusetts courts look first to the substantive law the parties select, if any, and they ordinarily respect such selection unless an intolerable conflict with Massachusetts policy would result. *Warren Bros. Co. v. Cardi Corp.,* 471 F.2d 1304, 1307 n.3 (1st Cir. 1973); *Massengale v. Transitron Electronic Corp.,* 385 F.2d 83, 86–87 (1st Cir. 1967). Where the parties do not specify the applicable substantive law, Massachusetts courts adhere to the conflicts rule that a contract of guaranty is governed by the laws of the state where the contract was received and acted upon by the guarantee's extension of credit. *Milliken v. Pratt,* 125 Mass. 374, 376 (1878), *cited in* Reporter's Note, Restatement (Second) of Conflict of Laws § 194 (1971). There is some doubt, however, whether the Massachusetts courts would follow this rule today. In *Choate, Hall & Stewart v. SCA Services, Inc.,* 378 Mass. 535, 392 N.E.2d 1045 (1979), the Massachusetts Supreme Judicial Court indicated that it soon might depart from traditional conflicts rules for contracts and adopt those set forth in the Restatement (Second) of Conflicts of Laws. Section 194 of the Restatement (Second) of Conflicts of Laws provides that the "validity of a contract of [guaranty] and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the law governing the principal obligation which the contract ... was intended to secure...." Fortunately, we need not speculate whether the Supreme Judicial Court would, on the facts before us, reject the traditional conflicts rule and opt for the

Restatement rule because, as we shall point out, both would require us to apply Massachusetts substantive law.

With these Massachusetts conflicts principles in mind, we determine the state to which we must look, in this case, for the substantive rule of decision. We first examine the guaranties in question to determine whether the parties chose the governing law. The guaranties contain no choice of law provision. They incorporate by reference, however, the terms of the Mama Tino notes the Rosenfields guaranteed. These notes provide that Massachusetts law should govern. Whether this means that the parties agreed that Massachusetts law governs the enforceability of these guaranties is an open question, but one we need not decide. For the application of either the rule as set forth in *Milliken v. Pratt*, 125 Mass. at 376, or the Restatement rule requires us to follow Massachusetts law. The former does so because the bank accepted the guaranties in Massachusetts and acted upon them there by renewing two of Mama Tino's notes. The latter does so because Massachusetts law governs the underlying notes. In sum, whether we view the case as one in which the parties stipulated in the guaranties the choice of law or one in which they did not, Massachusetts provides the rule of decision. We now consider the four defenses the Rosenfields interposed in resisting the bank's claim for payment.

### III.

#### A.

The Rosenfields contend that as a matter of law they were released from their guaranties on September 22, 1970, when New England Merchants, as part of its employment agreement with Nicholas Fiorentino, agreed not to call upon the Fiorentinos to pay off Mama Tino's debts. This forbearance by the bank, the Rosenfields conclude, amounted to an outright release of the Fiorentinos and, by operation of law, a release of them as well.[9] The Rosenfields cite *Hale v. Spaulding*, 145 Mass. 482, 14 N.E. 534 (1938), and *Matheson v. O'Kane*, 211 Mass. 91, 97 N.E. 638 (1912) in support of their position. The bank counters that these decisions do not support the Rosenfields because it did not *release* the Fiorentinos, but merely entered into a covenant not to sue which under Massachusetts law is not the equivalent of a release.

It is not necessary for us to decide whether the bank released the Fiorentinos on September 22, 1970, or merely agreed not to bring suit against them, because the rule that the release of one releases all is inoperative where the parties in writing evidence a contrary intent. *Hale v. Spaulding*, 145 Mass. at 483, 14 N.E. at 535. In this case, an intention that a release of one of the guarantors not release the others was evidenced in the guaranties themselves. The Rosenfields, the Fiorentinos and the bank therein agreed that the "release of any person or persons . . . may be effected without notice to *and without releasing* the undersigned." (Emphasis added.) In short, the Rosenfields agreed that the bank's release of the Fiorentinos would not operate to release them. The Massachusetts courts uniformly accept the arms-length agreements of contracting parties unless to do so would be contrary to public policy. *See Massengale v. Transitron Electronic Corp.*, 385 F.2d at 86–87. The Rosenfields point to no Massachusetts policy that would require us to depart from this rule, and we therefore reject their argument that they were released from guaranty liability on September 22, 1970.

#### B.

The Rosenfields contend that the district court erred in directing a verdict in favor of

---

**9.** Until 1963 Massachusetts followed the rule that the release of one potentially liable party releases all, absent the showing of a contrary intention by the parties, whether the claim sounded in tort or contract. Thereafter, Mass. Gen.Law Ch. 231B § 4 foreclosed application of the rule in tort-claim contexts. *See Hayden v. Ford Motor Company*, 278 F.Supp. 267 (D.Mass.1967). The rule remains applicable to contract cases, however, and we thus apply it here.

New England Merchants because the evidence raised jury issues as to three of their affirmative defenses: (1) their guaranties were delivered to the bank subject to the conditions that the bank lend Mama Tino $50,000 for working capital and that the Rosenfields provide the bank with their financial statements; (2) their guaranties were cancelled when, as the bank requested, Mama Tino brought suit against Jessup & Lamont; and (3) the statements and conduct of attorney J. J. Simons released the Rosenfields from liability under their guaranties. We first determine whether any of these defenses is legally sufficient, and, if so, whether the district court was correct in taking the case from the jury.

i.

Under Massachusetts law, if the Rosenfields' guaranties were delivered to New England Merchants subject to the condition that the bank lend Mama Tino $50,000, the bank's failure to make that loan would bar its recovery in its suit on the contracts of guaranty.[10] *See Tilo Roofing Co. v. Pellerin*, 331 Mass. 743, 745–46, 122 N.E.2d 460, 462 (1954); *Southeastern Bank & Trust Co. v. Pappas*, —— Mass.App. ——, 413 N.E.2d 1142 (1980). The availability of this defense depends, of course, on whether a jury could properly have found that the bank promised to lend Mama Tino $50,000 for working capital in exchange for the Rosenfields' guaranties.

The sufficiency of evidence is a federal question. *Boeing Co. v. Shipman*, 411 F.2d 365, 368 (5th Cir. 1969) (en banc). In determining whether to grant a directed verdict, the court must consider all the evidence, not just the evidence that supports the non-movant's case, in the light most favorable to the non-movant. This test also governs this court on appeal. *Jacobs v. Deaton, Inc.*, 654 F.2d 385, 386 (1981). While neither we nor the trial judge may make credibility choices, *Glazer v. Glazer*, 374 F.2d 390, 400 (5th Cir. 1967), *cert. denied*, 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90 (1968), neither court is required to accept, as credible, unsupported self-serving testimony that flies in the teeth of unimpeachable contradictory evidence and universal experience. *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 728–29 (5th Cir. 1977). *See United States v. Generes*, 405 U.S. 93, 106, 92 S.Ct. 827, 834, 31 L.Ed.2d 62 (1972) (directed verdict or judgment n. o. v. appropriate where the self-serving testimony of the non-moving party "does not bear the light of analysis"). If the facts and inferences presented at trial so strongly favor the movant that a reasonable jury could not arrive at a verdict against it, the court must direct a verdict. *Boeing Co. v. Shipman*, 411 F.2d at 374. Applying this test to the facts before us, we conclude that a reasonable jury could not have found that the guaranties were conditioned as the Rosenfields contend.

The Rosenfields' sole evidence in support of their argument that the guaranties were conditioned on a $50,000 bank loan is Coleman Rosenfield's self-serving testimony that before he executed his guaranty in February 1970 and, once again, before he re-executed it in April, New England Merchants said that the guaranty would not take effect until it loaned Mama Tino $50,000.[11]

---

10. The second condition the Rosenfields allege, that the bank conditioned its acceptance of the guaranties on receipt of the Rosenfields' and the Fiorentinos' financial statements, is of no significance. That condition was for the sole benefit of New England Merchants, which was therefore free to waive it. The Rosenfields plainly cannot use it to defeat the bank's claim.

11. The Rosenfields tried to bolster this testimony with the deposition testimony of Carl Shaeffer, an attorney for Butlers Bank. Shaeffer testified that as of May 5, 1970, New England Merchants had refused to lend $50,000 to Mama Tino and that during May he had several conversations with an officer of New England Merchants who first told him that New England Merchants would make such a loan and later that it would not. What New England Merchants' officers might have said in May about a possible loan to Mama Tino obviously had no bearing on whether in the preceding February or April the bank promised to make a $50,000 loan in exchange for the guaranties in issue, and the district court correctly refused to admit Shaeffer's testimony into evidence. See Fed.R.Evid. 401 and 402.

The record is replete with evidence that renders Coleman Rosenfield's testimony unworthy of any credit. First, Nicholas Fiorentino testified that the guaranties were not conditioned on a new $50,000 loan to Mama Tino, but on the renewal of the outstanding notes. Secondly, New England Merchants' officers, principally Constantinos Philips, said the bank never agreed to lend Mama Tino the additional $50,000 it needed for working capital, and their testimony was corroborated by other, unimpeached, evidence: Philips' February 2, 1970, letter to Nicholas Fiorentino, which was communicated to Rosenfield, stating that the bank "must hold up any further financing until we can grasp a better understanding of exactly what is and will be happening. . . . However, as discussed, before we can renew the notes which are due . . . in the amounts of $50,000 and $100,000 respectively, I must ask for the guaranties of yourself, Mrs. Fiorentino, Cole and Mrs. Rosenfield"; the undisputed statement of Philips at the April 9, 1970, meeting of Mama Tino's board of directors, with Coleman Rosenfield present, that the bank would not lend the company another $50,000 for working capital; and testimony concerning the April 21, 1970, board meeting where the major subject of discussion was whether Mama Tino would be able to raise an additional $50,000 in funds, and Coleman Rosenfield said nothing to suggest that New England Merchants had committed itself to making a $50,000 loan—in fact, he said that no further bank loans could be negotiated. Finally, there was evidence presented to the effect that Rosenfield, unable to secure additional financing, planned to raise the $50,000 by selling the company's surplus real estate and by suing Jessup & Lamont for failing to market a new stock issue, and he pursued this objective to the end. In the face of all this evidence, the district court was entitled to conclude that New England Merchants never promised to lend Mama Tino another $50,000 for working capital. The court therefore took appropriate action in not submitting the Rosenfields' conditional-delivery defense to the jury.

ii.

The Rosenfields contend that even if the guaranties they signed were valid and otherwise enforceable, they were cancelled by operation of law when Mama Tino sued Jessup & Lamont in Florida state court on June 3, 1970. The guaranties were cancelled, they say, because the bank promised to release the guarantors the moment Mama Tino sued Jessup & Lamont for failing to bring a new stock issue to market. This defense, like the conditional-delivery defense, is supported only by Coleman Rosenfield's self-serving testimony.

Rosenfield says, simply and boldly, that prior to June 3, 1970, Constantinos Philips told Nicholas Fiorentino that New England Merchants would cancel the guaranties if Mama Tino sued Jessup & Lamont. However, Rosenfield was not a party to this claimed conversation and Fiorentino denies that he had any conversations with the bank regarding a release of its claims against him before June 3. Fiorentino recalled that he continually attempted to negotiate his release after that date, but he insisted that he was not released prior to September 22, 1970, when he and his wife signed the releases described in Part III A, *supra*, and that release had nothing whatsoever to do with a suit against Jessup & Lamont.

In an attempt to bolster his claim, Rosenfield introduced a memorandum containing a relevant internal communication between officers of New England Merchants, dated June 18, 1970. That memorandum corroborated what the bank's officers told the jury about their conversation with Fiorentino concerning a possible suit against Jessup & Lamont and effectively destroyed Rosenfield's claim that the conversation occurred prior to June 3. The memorandum reads in pertinent part:

[Vincent Palumbo] and I [R. T. McAlear] called Nick Fiorentino [today]. . . . Cole Rosenfield has taken a three week junket to Mexico and Nick is furious as he feels he has been left holding the bag. Aside from that we told Nick that the bank was going to begin legal action

against [Mama Tino,] Nick and Coleman, as we had to protect our position. We have agreed with Nick that if he will file suit against Jessup & Lamont and the proceeds be applied against the guarantee, we would not follow up on our suits against him. This is not in writing anywhere but is an agreement between the bank and Nick Fiorentino . . . .

Nicholas Fiorentino never accepted the bank's offer; nor did he file suit against Jessup & Lamont. There was no probative evidence to support the Rosenfields' cancellation defense.

### iii.

The Rosenfields contend that attorney Simons' statement to Coleman Rosenfield that he would not bring suit against the guarantors in behalf of New England Merchants, constituted an abandonment by the bank of the guaranties in issue. The bank's four-year delay in instituting this suit is said to be strong evidence of the bank's intention not to hold the Rosenfields accountable.

For sake of argument, we assume that Simons made the alleged statement and that the statement is the bank's. The Rosenfields nevertheless have no defense. They gave no consideration to the bank for the claimed discharge, and consideration was necessary for Simons' statement to be enforceable at law. *Sloan v. Burrows,* 357 Mass. 412, 258 N.E.2d 303, 304 (1970); *Marcellino v. Carma, Inc.,* 3 Mass.App. 722, 324 N.E.2d 629 (1975).

### IV.

The Rosenfields' final claim is that the district court should have granted their motion for a mistrial. As grounds for that motion, the Rosenfields referred to the court's facial expressions and its statements to Coleman Rosenfield while on the witness stand, and to the court's obvious disbelief of Rosenfield's testimony, all of which allegedly prejudiced the plaintiffs' case before the jury. Because the court properly directed a

verdict, prejudice to the jury is irrelevant. The judgment of the district court is

AFFIRMED.