DATAMATIC, INC.

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION.

Civ. A. No. 83–1652.

United States District Court, W.D. Louisiana, Lafayette-Opelousas Division.

June 24, 1985.

Henry C. Perret, Jr., Lafayette, La., for plaintiff.

Robert E. Barkley, Jr., Sessions, Fishman, Rosenson, Boisfontaine, Nathan & Winn, New Orleans, La., for defendant.

RULING

SHAW, District Judge.

Now before the Court is the motion of defendant International Business Machines Corporation (IBM) for summary judgment, alleging that the rights of plaintiff Datamatic, Inc. against IBM are limited to those of the original purchasers of the computer equipment at issue under IBM's limited warranty. Datamatic contends that it cannot be limited to the original purchasers' rights since it was not privy to their purchase contract with IBM, and that IBM's limited warranties are contrary to Louisiana public policy.

In this case, plaintiff Datamatic, a computer service bureau, acquired used IBM computer equipment[1] in 1974 and 1975 from ITEL Corporation, a Dallas-based computer leasing company. The equipment was originally sold by IBM to four purchasers in 1968, including American Express Company in New York, Hardware Mutual Casualty Company in Wisconsin, FWD Corporation in Wisconsin and SSI Corporation in California. Each of these four original purchasers bought the equipment pursuant to a purchase agreement which expressly limited IBM's liability for defective parts to replacement if the defect

1. The equipment was a tape system consisting of two controllers (2804's) and ten tape drives (2401's and 2402's).

is discovered within one year from the date of installation.[2] The purchase agreements also provided that "IBM shall in no event have obligations or liabilities for consequential damages," and that:

> [t]he foregoing Warranties and Limitations are exclusive remedies and are in lieu of· all other warranties express or implied, including but not limited to the implied warranty of merchantability.

ITEL subsequently acquired the equipment from the original purchasers or their successors in title and sold it to Datamatic in 1974 and 1975 in Dallas for approximately $75,000.00, paid in monthly installments over a four-year period. After Datamatic acquired the equipment it was serviced by IBM pursuant to a 1973 maintenance contract between the two companies, in which Datamatic and IBM agreed that:

> [t]he Customer agrees that IBM will not be liable for any consequential damages even if IBM has been advised of the possibility of such damages.

Datamatic operated the equipment twenty-four hours a day for five years until 1980,[3] when it curtailed operations, relocated its offices and sold some of its equipment.[4]

Datamatic contends that the equipment it purchased from ITEL included a defectively designed, manufactured or assembled "terminator."[5] According to Datamatic, the defective terminator was incorporated into one of its two tape systems in 1975 and the tape system which contained this terminator continuously malfunctioned until June 1982. Datamatic claims that IBM attempted to repair the tape system many times during this period, but failed to do so.

In June 1982, the IBM customer engineer was servicing the malfunctioning tape system when he discovered that certain terminals or pins in the defective terminator were "wire-wrapped" rather than soldered. According to Datamatic, the repairman described the problem as a "manufacturer's defect" and repaired the terminator by soldering the terminals. Datamatic claims that the terminator has functioned normally ever since.[6]

IBM claims that a few days after the equipment was repaired, Datamatic demanded a refund from IBM for all the maintenance charges attributable to the terminator, and the two parties began .negotiations. Datamatic filed this suit a year later, claiming that the unsoldered pins constituted a redhibitory defect. Datamatic contends that its original sale should be voided because the defective terminator rendered the tape system so inconvenient that the company would not have purchased it had it known of the vice. Furthermore, the malfunctioning system allegedly caused Datamatic to incur excessive down time expenses, forcing it to rerun work already put into the system and to incur substantial maintenance and repair expenses.

Finally, Datamatic claims that the defective equipment damaged its business reputation and caused a loss of substantial profits because customers became dissatisfied with the company's work. Therefore, Datamatic is seeking the following damages: maintenance fees due to the defective equipment, extra maintenance costs, cost of rerunning the work, cost for when the tape system was "down", lost profits due to customer dissatisfaction, damage to business reputation, purchase price of the

**2.** The dates of installation were 1966, 1967, 1968 and 1969.

**3.** In 1980 Datamatic's largest customer, Guaranty Bank, went to an in-house computer.

**4.** Datamatic sold one 2804 controller and one 2402 tape drive (comprised of two tape drives). Shortly thereafter Parker St. Amant, one of the two co-owners of Datamatic, sold his interest in the company to Roland Ditch, the other co-owner.

**5.** According to IBM, the terminator is a device housed in the tape drive which is designed to terminate the signal. IBM claims that it did not manufacture the terminator in question, but it was manufactured by a third party.

**6.** In 1984 Datamatic closed down its operations completely.

defective machinery, and property taxes on the equipment price.

Although IBM initially argued that New York law should govern this dispute, it has since contended that the motion should succeed regardless of whether Louisiana or New York law applies. Likewise, Datamatic initially argued that Louisiana law should apply, but maintains that the motion must be denied under New York law as well. This Court agrees that it must reach the same result under either Louisiana or New York law, but finds that Louisiana law governs this dispute for the reasons hereinafter stated.

■■ In diversity cases, federal courts must apply the conflicts of law rules of the states in which they sit. *Griffin v. McCoach*, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481 (1941). Accordingly, this Court must look to the conflicts rules of Louisiana to determine whether Louisiana or New York law will govern this case. Louisiana courts first look to any contractual directive, *Delhomme Industries, Inc. v. Houston Beechcraft, Inc.*, 669 F.2d 1049 (5th Cir.1982), and if no contractual directive is present, the courts look to the "substantial interest" principles embodied in Section 6 of the Second Restatement of Conflicts. *Brinkley & West, Inc. v. Foremost Insurance Company*, 499 F.2d 928 (5th Cir.1974); *Jaegers v. Royal Indemnity Company*, 276 So.2d 309 (La.1973).

■ In this case, each of the original IBM purchase agreements provided that New York law would govern any disputes. This Court finds that Datamatic was not a party to these original agreements, however, and that the choice of law provisions should not be enforced against Datamatic regardless of whether the limited warranty provision is enforceable. Although Louisi-

ana courts have enforced choice of law provisions agreed to by the parties in dispute, *Delhomme*, 669 F.2d at 1049, this Court finds no Louisiana cases which have held the ultimate purchaser to the terms of a choice of law provision between the manufacturer and the first purchaser, to which it was not a party. The First Circuit case cited by IBM for this proposition, applying Massachusetts law, involved the rights of a third party beneficiary to the contract rather than a "stranger" to the original contract, as in this case. *Massengale v. Transition Electronic Corporation*, 385 F.2d 83 (1st Cir.1967). Datamatic had no notice that New York law would apply to this case; in fact, its purchase agreements with ITEL stipulated that California law would govern.[7]

Since the choice of law provisions in the original IBM contracts are not enforceable against Datamatic, this Court must analyze the "substantial interest" factors of Section 6 of the Second Restatement of Conflicts. Redhibition cases have been aligned with tort actions in conflicts analysis, *Lartigue v. R.J. Reynolds Tobacco*, 317 F.2d 19 (5th Cir.1963). Section 145 of the Second Restatement lists four choice of law factors[8] to apply in tort cases: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, place of incorporation and business of the parties and (4) the place where the parties' relationship is seated.

■ In this case, the equipment was purchased in Texas for use in Louisiana, where the equipment has remained. The defects were discovered in Louisiana and the damages were likewise sustained in Louisiana. The plaintiff is a Louisiana corporation; IBM is authorized to do business in Louisiana and has offices and employees here.

7. Choice of law provisions may be distinguished from manufacturer's warranties, which are governed by La.Civ.Code art. 2503. *See* discussion at pp. 721–722, *infra*. Louisiana courts have subrogated buyers to the warranty rights of their sellers' under this provision, particularly as to prescription, but have never used this provision to enforce choice of law clauses.

8. Section 145 also provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local laws of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in Section 6."

IBM also serviced the machines in Louisiana during plaintiff's ownership. Therefore, the Section 145 factors indicate that Louisiana has a greater relationship to the dispute than New York, which is IBM's principal place of business and place of incorporation. The relevant factors of Section 6 [9] also point toward the application of Louisiana law. In *Commercial Union Insurance Companies v. Upjohn Company*, 409 F.Supp. 453 (W.D.La.1976), the court applied Louisiana law under circumstances very similar to this case. Therefore, this Court finds that Louisiana law should govern this dispute.

Having decided the conflicts of law dispute, there are three separate issues which must be addressed in this case: first, whether Datamatic can bring a redhibitory action against IBM: second, whether IBM's limited warranty is valid under Louisiana law, and third, whether IBM can rely on this warranty to limit any obligation towards Datamatic. Datamatic has also raised some peripheral issues, claiming that this court should abstain from deciding the case and that Datamatic may have additional fraud or tort claims against IBM.

■ Addressing the first issue, this Court holds that Datamatic is entitled to bring a redhibition action against IBM, since privity of contract is no longer a prerequisite to an action in redhibition. In *Media Production Consultants, Inc. v. Mercedes-Benz of North America*, 262 La. 80, 262 So.2d 377 (1972), the Louisiana Supreme Court abolished the previous requirement of privity between the purchaser of a defective product and its manufacturer, holding that a buyer may proceed directly against the manufacturer of a defective product in a redhibition action. *See also Rey v. Cuccia*, 298 So.2d 840 (La. 1974); *Austin v. North American Forest Products*, 656 F.2d 1076 (5th Cir.1981).

Thus subsequent purchasers, such as Datamatic in this case, are now able to sue manufacturers like IBM for product defects in redhibitory actions.

■ IBM has challenged Datamatic's right to bring this action, however, under the doctrine of waiver by use or conduct. According to IBM, Datamatic has *waived* its redhibitory rights because it continued to use the computer equipment for a considerable period of time with the knowledge that it was not performing properly, citing *C.T. Street, Inc. v. Breland*, 88 So.2d 56 (La.App.1956) (plaintiff used equipment and made payments for four months); *Scott v. Boylston*, 177 So. 812 (La.App.2d Cir.1937) (plaintiff used equipment and made payments for twelve months).[10] In this case Datamatic used the equipment continuously for eight years, from 1975 until it filed suit in 1983, and has admitted that it was aware that the equipment was malfunctioning during this time. Datamatic also paid ITEL in full for the equipment through monthly payments extending over four years, from 1975 to 1979.

Yet Datamatic has successfully distinguished the cases cited by IBM, since the purchasers in those cases all had specific knowledge of the defects involved. For example, in *C.T. Street*, 88 So.2d at 57, the court stated:

> [w]hen a purchaser uses the thing which he has purchased for a considerable period of time *with knowledge of its defects* and makes part payments on the purchase price thereof without protest, he cannot, when sued for the balance due, repudiate the contract on the ground of redhibition. (Citation omitted, emphasis added.)

In *C.T. Street* as well as the other decisions cited by IBM, the courts' holdings were based upon the purchaser's knowledge of

---

**9.** These factors include: the relevant policies of the forum, the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; the protection of justified expectations; the basic policies underlying the particular field of law; certainty, predictability and uniformity

of result; and ease in the determination and application of the law to be applied.

**10.** IBM also cites *Cleaners Equipment Corp. v. Weil Cleaners*, 178 So. 771 (La.App.2d Cir.1937) and *Goode-Cage Drug Co. v. Ives*, 133 So. 813 (La.App.2d Cir.1931).

the defect. In this case, however, Datamatic did not become aware of the specific defect until June 1982.[11] Therefore IBM's waiver by use or conduct theory must fail.

■ The second question which must be addressed is whether IBM's limited warranty is valid under Louisiana law. Datamatic alleges that IBM's limited warranty provisions violate Louisiana public policy and were both inconspicuous and not brought to its attention.[12] IBM responds, however, that there is no violation of public policy since Louisiana law allows waiver of implied warranties. Moreover, IBM claims that limitation of liability provisions need not be conspicuous in contracts between businessmen.

Louisiana law provides that "parties may, by particular agreement, add to the obligation of warranty, which results of right from the sale, or diminish its effect; they may even agree that the seller shall not be subject to any warranty." LSA–C.C. art. 2503.[13] *See also* LSA–C.C. art. 1764(A)(2) (warranties are implied in every sale but may be modified or renounced without changing the character of the contract). Louisiana courts have also held that parties are free to limit implied warranties by express agreement, but the limitation must be clear and unambiguous. *See, e.g., Rey v. Cuccia,* 298 So.2d 840 (La.1974); *Hob's Refrigeration & Air Conditioning, Inc. v. Poche,* 304 So.2d 326 (La.1974). This Court finds that the limitation of warranty provision in this case was not contrary to Louisiana public policy

since it was clear and unambiguous on its face.

Datamatic also claims that the limited warranty provision is void because it was inconspicuous and never brought to its attention. Louisiana courts have tended to strictly enforce these two requirements in consumer transactions, such as automobile purchases. *See, e.g., Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc.,* 262 La. 80, 262 So.2d 377 (1972). Yet the courts have not always applied these requirements in cases involving sophisticated parties, since the businessman-purchaser is presumed to be aware of the contents of the contracts he signs. *See, Anderson v. Bohn Ford, Inc.,* 291 So.2d 786 (La.App. 4th Cir.1973), *cert. denied,* 294 So.2d 829 (La.1974); *Louisiana National Leasing Corporation v. ADF Service, Inc.,* 377 So.2d 92 (La.1979).

■ This Court finds that the original purchasers of the computer equipment were all sophisticated businesses, which presumably had knowledge of the contractual provisions they signed. Moreover, the sales contracts by which Datamatic acquired the used equipment from ITEL provided a similar exclusion of implied warranties, stating: "[p]urchaser shall be entitled to the benefit of any applicable manufacturer's warranties, and such warranties are hereby assigned by Seller to Purchaser for the benefit of Purchaser." Therefore Datamatic had notice that its manufacturer's

---

**11.** Although IBM argues that precise knowledge of the exact defect or of the cause of the defect is not necessary, the cases cited by IBM are cases *allowing* redhibitory actions despite the purchaser's lack of precise knowledge of the defect or cause. *See, e.g., Jordan v. Security Co.,* 425 So.2d 333 (La.App. 3rd Cir.1982); *Moreno's, Inc. v. Lake Charles Catholic High Schools, Inc.,* 315 So.2d 660 (La.1975). IBM has cited no causes *requiring* the purchaser to bring a redhibitory action the first time the equipment malfunctions.

**12.** Datamatic also claims that the limited warranty provisions represent a failure of essential purpose and were unconscionable under New York law. Although there is no need to address

these two issues under Louisiana law, this Court notes that Datamatic has not sufficiently alleged either of these two claims. The provisions were not unconscionable since there was no "surprise" in this case; Datamatic had notice that it was receiving only the same warranties possessed by its seller. There is also no showing of failure of essential purpose, since the equipment was used for fifteen years.

**13.** Although article 2503 specifically refers to warranties against eviction rather than warranties of fitness, many courts have applied article 2503 to warranties of fitness as well. *See, e.g., Slack v. Inglehart,* 386 So.2d 967, 970 (La.App. 3rd Cir.1980).

warranties were limited to those received by the original purchasers.[11]

Finally, the third major issue is whether IBM can enforce its limited warranty provisions against Datamatic, a subsequent purchaser. Although Louisiana courts have never addressed this specific issue,[15] several cases offer guidance and indicate the best policy rationale.

As stated earlier, many Louisiana courts have broadly applied LSA–C.C. art. 2503 to cases involving warranties of fitness as well as warranties against eviction. *See, e.g., Aizpurua v. Crane Pool Co., Inc.,* 449 So.2d 471 (La.1984); note 13, *supra.* Article 2503 not only enables parties to limit the obligation of warranty, but also provides that "whether warranty be excluded or not the buyer shall become subrogated to the seller's rights and actions in warranty against all others." This provision has been cited in many cases to support the theory that subsequent purchasers may recover against manufacturers or other predecessors in the chain of title in absence of privity. *See, e.g., Aizpurua,* 449 So.2d at 472; *Huffman-Euro Motors v. Physical Therapy Services, Ltd.,* 373 So.2d 565 (La. App. 3rd Cir.1979); *Cotton States Chemical Co. v. Larrison Enterprises, Inc.,* 342 So.2d 1212 (La.App.2d Cir.1977); *Landry v. Baton Rouge Lumber Company,* 434 So.2d 1144 (La.App. 1st Cir.1983); *Moreno's, Inc. v. Lake Charles Catholic High Schools, Inc.,* 315 So.2d 660 (La.1975).[16]

Although Louisiana courts have never actually enforced a limited warranty provision against a subsequent purchaser in the chain of title under article 2503, one court relied upon this provision to limit the subsequent purchaser's prescriptive period. In *DeSoto v. Ellis,* 393 So.2d 847 (La.App.2d Cir.1981), the court cited article 2503 for the proposition that subvendees are:

> entitled to bring any action the vendor could have brought against *his* vendor ... a subvendee is subrogated to the rights of his vendor and his vendor's warranty against redhibitory defects from the vendor who sold the property to him, and so on up the chain of title.

*Id.* at 847. The court held that the plaintiff's suit had prescribed since the plaintiff's predecessors had only one year to institute a redhibition action after the discovery of the defect, and the plaintiff had acquired the remainder of this prescriptive period under his warranty deed.

■ Applying article 2503 to this case, we must hold that Datamatic acquired only the limited warranties possessed by its predecessors in title when it signed the purchase agreement with ITEL. This result is not contrary to any existing Louisiana statutory or case law, and it ensures that subsequent purchasers do not acquire greater rights against the manufacturer than those possessed by the original purchaser. In this case Datamatic had *notice* in its agreement with ITEL that its warran-

**14.** Datamatic claims that IBM cannot enforce the limited warranties in the original contracts against Datamatic since IBM had prohibited assignment of any rights, duties or obligations unless specifically approved by IBM, and IBM has never admitted that it approved the assignment. IBM responds, however, that the provision only illustrates IBM's reluctance to extent its potential liability beyond that set forth in the original contracts; the provision is designed only to safeguard IBM from being exposed to greater liability by subsequent purchasers. This Court adopts IBM's position on this issue, and finds that Datamatic's contract with ITEL put it on notice that there might be limited manufacturer's warranties.

**15.** Given the complexity of the issues and the lack of state court direction, Datamatic suggested in its second supplemental brief that this

Court should abstain and direct the parties to have a state court decide these issues. Abstention is an extraordinary and narrow exception, however; the mere existence of difficult issues of state law does not justify abstention. *Meredith v. City of Winter Haven,* 320 U.S. 228, 235–37, 64 S.Ct. 7, 11–12, 88 L.Ed. 9 (1943).

**16.** Datamatic argues that the subrogation language in article 2503 has existed since 1924 but was never utilized since *privity* was still a requirement for redhibition actions. Datamatic maintains that this subrogation language has been obsolete following the elimination of the privity requirement in *Media.* Yet the courts seem to disagree with this reasoning in the five decisions cited above, however, relying on article 2503 to support the subsequent purchaser's cause of action against the manufacturer.

ties might be limited, and Datamatic could have easily discovered the exact scope of its rights against IBM. On the other hand, IBM did everything possible to attempt to limit its warranties with *all* purchasers, since it had no feasible way to discover subsequent purchasers and advise them of their limited rights. To allow Datamatic to pursue unlimited rights against IBM would render limited warranties almost meaningless to a manufacturer, and would thwart the apparent policy goals of article 2503 as expressed in *DeSoto* and other cases. Subsequent purchasers such as Datamatic should bear the responsibility of checking what rights they are acquiring against the manufacturer rather than requiring manufacturers to track down all subsequent purchasers of their products.

Datamatic has argued that it has direct, judicially-created rights against IBM, citing *Media*, and therefore it is not inconsistent for it to have greater rights against IBM than the original purchasers. This Court cannot accept that analysis, however, since Louisiana courts are still applying article 2503 to enable subsequent purchasers without privity to pursue the same rights against the manufacturers as those possessed by the original purchasers. Nor will this Court allow Datamatic to assert new fraud [17] or tort claims against IBM, since it has not made the appropriate allegations. Furthermore, Datamatic cannot rely on La.Civil Code article 2531 since this provision has never been applied to defeat a manufacturer's limited warranty against a subsequent purchaser through subrogation; article 2531 serves only to defeat a limited warranty between the manufacturer and seller if the seller has been held liable to the buyer.[18]

Therefore, as the court held in *R & L Grain Co. v. Chicago Eastern Corp.*, 531 F.Supp. 201 (N.D.Ill.1981), Datamatic is bound by the warranty disclaimers and damage exclusions contained in the original IBM sales contracts even though it was not a party to those contracts. Since Datamatic claims title to the equipment, which it derivatively obtained from the IBM sales contracts, it takes its title subject to the warranty limitations in those contracts.

Accordingly, the motion for summary judgment filed by defendant IBM is hereby GRANTED and Datamatic's claims are hereby DISMISSED. Counsel for mover shall submit a judgment in conformity with this ruling within ten (10) days hereof.

---

**17.** Datamatic has attempted to assert a fraud claim against IBM under La. Civil Code article 2548 in its supplemental brief in opposition to IBM's summary judgment motion, but has not shown that IBM made intentional misrepresentations or false declarations regarding the equipment. Even if Datamatic were to amend its complaint to plead fraud, such a claim has probably prescribed.

**18.** Article 2531 provides in part: "In any case in which the seller is held liable because of redhibitory defects in the thing sold, the seller shall have a corresponding and similar right of action against the manufacturer of the thing for any losses sustained by the seller, and further provided that any provision of any franchise or manufacturer-seller contract or agreement attempting to limit, diminish or prevent such recoupment by the seller shall not be given any force or effect.